# OHIO *v.* ROBERTS

No. 78–756.   Argued November 26, 1979—Decided June 25, 1980

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, POWELL, and REHNQUIST, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL and STEVENS, JJ., joined, *post,* p. 77.

*John E. Shoop* argued the cause and filed a brief for petitioner.

*Marvin R. Plasco* argued the cause and filed a brief for respondent.*

*Solicitor General McCree, Assistant Attorney General Heymann, Sara

58

Mr. Justice Blackmun delivered the opinion of the Court.

This case presents issues concerning the constitutional propriety of the introduction in evidence of the preliminary hearing testimony of a witness not produced at the defendant's subsequent state criminal trial.

I

Local police arrested respondent, Herschel Roberts, on January 7, 1975, in Lake County, Ohio. Roberts was charged with forgery of a check in the name of Bernard Isaacs, and with possession of stolen credit cards belonging to Isaacs and his wife Amy.

A preliminary hearing was held in Municipal Court on January 10. The prosecution called several witnesses, including Mr. Isaacs. Respondent's appointed counsel had seen the Isaacs' daughter, Anita, in the courthouse hallway, and called her as the defense's only witness. Anita Isaacs testified that she knew respondent, and that she had permitted him to use her apartment for several days while she was away. Defense counsel questioned Anita at some length and attempted to elicit from her an admission that she had given respondent checks and the credit cards without informing him that she did not have permission to use them. Anita, however, denied this. Respondent's attorney did not ask to have the witness declared hostile and did not request permission to place her on cross-examination. The prosecutor did not question Anita.

A county grand jury subsequently indicted respondent for forgery, for receiving stolen property (including the credit cards), and for possession of heroin. The attorney who represented respondent at the preliminary hearing withdrew upon

*Sun Beale, Jerome M. Feit,* and *Kathleen A. Felton* filed a brief for the United States as *amicus curiae* urging reversal.

*Steven M. Cox* filed a brief for the Ohio Public Defenders Association as *amicus curiae* urging affirmance.

becoming a Municipal Court Judge, and new counsel was appointed for Roberts.

Between November 1975 and March 1976, five subpoenas for four different trial dates [1] were issued to Anita at her parents' Ohio residence. The last three carried a written instruction that Anita should "call before appearing." She was not at the residence when these were executed. She did not telephone and she did not appear at trial.

In March 1976, the case went to trial before a jury in the Court of Common Pleas. Respondent took the stand and testified that Anita Isaacs had given him her parents' checkbook and credit cards with the understanding that he could use them. Tr. 231–232. Relying on Ohio Rev. Code Ann. § 2945.49 (1975),[2] which permits the use of preliminary examination testimony of a witness who "cannot for any reason be produced at the trial," the State, on rebuttal, offered the transcript of Anita's testimony. Tr. 273–274.

Asserting a violation of the Confrontation Clause and, indeed, the unconstitutionality thereunder of § 2945.49, the defense objected to the use of the transcript. The trial court conducted a *voir dire* hearing as to its admissibility. Tr. 194– 199. Amy Isaacs, the sole witness at *voir dire*, was questioned by both the prosecutor and defense counsel concerning her daughter's whereabouts. Anita, according to her mother, left home for Tucson, Ariz., soon after the prelimi-

---

[1] A number of continuances were granted for reasons unrelated to Anita's absence.

[2] The statute reads:

"Testimony taken at an examination or a preliminary hearing at which the defendant is present, or at a former trial of the cause, or taken by deposition at the instance of the defendant or the state, may be used whenever the witness giving such testimony dies, or cannot for any reason be produced at the trial, or whenever the witness has, since giving such testimony, become incapacitated to testify. If such former testimony is contained within a bill of exceptions, or authenticated transcript of such testimony, it shall be proven by the bill of exceptions, or transcript, otherwise by other testimony."

nary hearing. About a year before the trial, a San Francisco social worker was in communication with the Isaacs about a welfare application Anita had filed there. Through the social worker, the Isaacs reached their daughter once by telephone. Since then, however, Anita had called her parents only one other time and had not been in touch with her two sisters. When Anita called, some seven or eight months before trial, she told her parents that she "was traveling" outside Ohio, but did not reveal the place from which she called. Mrs. Isaacs stated that she knew of no way to reach Anita in case of an emergency. App. 9. Nor did she "know of anybody who knows where she is." *Id.*, at 11. The trial court admitted the transcript into evidence. Respondent was convicted on all counts.

The Court of Appeals of Ohio reversed. After reviewing the *voir dire*, that court concluded that the prosecution had failed to make a showing of a "good-faith effort" to secure the absent witness' attendance, as required by *Barber* v. *Page*, 390 U. S. 719, 722–725 (1968). The court noted that "we have no witness from the prosecution to testify . . . that no one on behalf of the State could determine Anita's whereabouts, [or] that anyone had exhausted contact with the San Francisco social worker." App. 5. Unavailability would have been established, the court said, "[h]ad the State demonstrated that its subpoenas were never actually served on the witness and that they were unable to make contact in any way with the witness. . . . Until the Isaacs' voir dire, requested by the defense, the State had done nothing, absolutely nothing, to show the Court that Anita would be absent because of unavailability, and they showed no effort having been made to seek out her whereabouts for purpose of trial." *Ibid.*

The Supreme Court of Ohio, by a 4–3 vote, affirmed, but did so on other grounds. 55 Ohio St. 2d 191, 378 N. E. 2d 492 (1978). It first held that the Court of Appeals had erred in concluding that Anita was not unavailable. *Barber* v. *Page* was distinguished as a case in which "the government knew where

the absent witness was," whereas Anita's "whereabouts were entirely unknown." 55 Ohio St. 2d, at 194, 378 N. E. 2d, at 495. "[T]he trial judge could reasonably have concluded from Mrs. Isaacs' *voir dire* testimony that due diligence could not have procured the attendance of Anita Isaacs"; he "could reasonably infer that Anita had left San Francisco"; and he "could properly hold that the witness was unavailable to testify in person." *Id.*, at 195, 378 N. E. 2d, at 495–496.

The court, nonetheless, held that the transcript was inadmissible. Reasoning that normally there is little incentive to cross-examine a witness at a preliminary hearing, where the "ultimate issue" is only probable cause, *id.*, at 196, 378 N. E. 2d, at 496, and citing the dissenting opinion in *California v. Green*, 399 U. S. 149, 189 (1970), the court held that the mere opportunity to cross-examine at a preliminary hearing did not afford constitutional confrontation for purposes of trial. See 55 Ohio St. 2d, at 191, 378 N. E. 2d, at 493 (court syllabus).[3] The court distinguished *Green*, where this Court had ruled admissible the preliminary hearing testimony of a declarant who was present at trial, but claimed forgetfulness. The Ohio court perceived a "dictum" in *Green* that suggested that the mere opportunity to cross-examine renders preliminary hearing testimony admissible. 55 Ohio St. 2d, at 198, and n. 2, 378 N. E. 2d, at 497, and n. 2, citing 399 U. S., at 165–166. But the court concluded that *Green* "goes no further than to suggest that cross-examination actually conducted at preliminary hearing *may* afford adequate confrontation for purposes of a later trial." 55 Ohio St. 2d, at 199, 378 N. E. 2d, at 497 (emphasis in original). Since Anita had not been cross-examined at the preliminary hearing and was absent at trial, the introduction of the transcript of her testimony was held to have violated respondent's confrontation

---

[3] The Ohio "syllabus rule" is stated in *Baltimore & Ohio R. Co. v. Baillie*, 112 Ohio St. 567, 570, 148 N. E. 233, 234 (1925). See *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U. S. 562, 565 (1977).

right. The three dissenting justices would have ruled that " 'the test is the opportunity for full and complete cross-examination rather than the use which is made of that opportunity' " (citing *United States* v. *Allen,* 409 F. 2d 611, 613 (CA10 1969)). 55 Ohio St. 2d, at 200, 378 N. E. 2d, at 498.

We granted certiorari to consider these important issues under the Confrontation Clause. 441 U. S. 904 (1979).

## II

### A

The Court here is called upon to consider once again the relationship between the Confrontation Clause and the hearsay rule with its many exceptions. The basic rule against hearsay, of course, is riddled with exceptions developed over three centuries. See E. Cleary, McCormick on Evidence § 244 (2d ed. 1972) (McCormick) (history of rule); *id.,* §§ 252–324 (exceptions).[4] These exceptions vary among jurisdictions as to number, nature, and detail. See, *e. g.,* Fed. Rules Evid. 803, 804 (over 20 specified exceptions). But every set of exceptions seems to fit an apt description offered more than 40 years ago: "an old-fashioned crazy quilt made of patches cut from a group of paintings by cubists, futurists and surrealists." Morgan & Maguire, Looking Backward and Forward at Evidence, 50 Harv. L. Rev. 909, 921 (1937).

The Sixth Amendment's Confrontation Clause, made applicable to the States through the Fourteenth Amendment, *Pointer* v. *Texas,* 380 U. S. 400, 403–405 (1965); *Davis* v. *Alaska,* 415 U. S. 308, 315 (1974), provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be con-

---

[4] With the caveat, "[s]implification has a measure of falsification," McCormick defines hearsay evidence as "testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter." § 246, p. 584.

fronted with the witnesses against him." If one were to read this language literally, it would require, on objection, the exclusion of any statement made by a declarant not present at trial. See *Mattox* v. *United States,* 156 U. S. 237, 243 (1895) ("[T]here could be nothing more directly contrary to the letter of the provision in question than the admission of dying declarations"). But, if thus applied, the Clause would abrogate virtually every hearsay exception, a result long rejected as unintended and too extreme.

The historical evidence leaves little doubt, however, that the Clause was intended to exclude some hearsay. See *California* v. *Green,* 399 U. S., at 156–157, and nn. 9 and 10; see also McCormick § 252, p. 606. Moreover, underlying policies support the same conclusion. The Court has emphasized that the Confrontation Clause reflects a preference for face-to-face confrontation at trial,[5] and that "a primary interest secured by [the provision] is the right of cross-examination." *Douglas* v. *Alabama,* 380 U. S. 415, 418 (1965).[6] In short, the Clause envisions

"a personal examination and cross-examination of the

---

[5] See *California* v. *Green,* 399 U. S. 149, 157 (1970) ("it is this literal right to 'confront' the witness at the time of the trial that forms the core of the values furthered by the Confrontation Clause"); *id.,* at 172–189 (concurring opinion); *Barber* v. *Page,* 390 U. S. 719, 725 (1968); *Dowdell* v. *United States,* 221 U. S. 325, 330 (1911).

[6] See also *Davis* v. *Alaska,* 415 U. S. 308, 315 (1974); *Bruton* v. *United States,* 391 U. S. 123, 126 (1968); *Pointer* v. *Texas,* 380 U. S. 400, 406–407 (1965); *California* v. *Green,* 399 U. S., at 158 (cross-examination is the " 'greatest legal engine ever invented for the discovery of truth,' " quoting 5 J. Wigmore, Evidence § 1367 (3d ed. 1940)). Of course, these purposes are interrelated, since one critical goal of cross-examination is to draw out discrediting demeanor to be viewed by the factfinder. See *Government of Virgin Islands* v. *Aquino,* 378 F. 2d 540, 548 (CA3 1967).

Confrontation at trial also operates to ensure reliability in other ways. First, "[t]he requirement of personal presence . . . undoubtedly makes it more difficult to lie against someone, particularly if that person is an accused and present at trial." 4 J. Weinstein & M. Berger, Weinstein's

witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Mattox* v. *United States,* 156 U. S., at 242–243.

These means of testing accuracy are so important that the absence of proper confrontation at trial "calls into question the ultimate 'integrity of the fact-finding process.'" *Chambers* v. *Mississippi,* 410 U. S. 284, 295 (1973), quoting *Berger* v. *California,* 393 U. S. 314, 315 (1969).

The Court, however, has recognized that competing interests, if "closely examined," *Chambers* v. *Mississippi,* 410 U. S., at 295, may warrant dispensing with confrontation at trial. See *Mattox* v. *United States,* 156 U. S., at 243 ("general rules of law of this kind, however beneficent in their operation and valuable to the accused, must occasionally give way to considerations of public policy and the necessities of the case"). Significantly, every jurisdiction has a strong interest in effective law enforcement, and in the development and precise formulation of the rules of evidence applicable in criminal proceedings. See *Snyder* v. *Massachusetts,* 291 U. S. 97, 107 (1934); *California* v. *Green,* 399 U. S., at 171–172 (concurring opinion).

This Court, in a series of cases, has sought to accommodate these competing interests. True to the common-law tradition, the process has been gradual, building on past decisions, drawing on new experience, and responding to changing conditions. The Court has not sought to "map out a theory of the Confrontation Clause that would determine the validity

Evidence ¶ 800 [01], p. 800–10 (1979). See also Note, 54 Iowa L. Rev. 360, 365 (1968). Second, it "insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury." *California* v. *Green,* 399 U. S., at 158.

of all . . . hearsay 'exceptions.' " *California* v. *Green,* 399 U. S., at 162. But a general approach to the problem is discernible.

## B

The Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay. First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case (including cases where prior cross-examination has occurred), the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant. See *Mancusi* v. *Stubbs,* 408 U. S. 204 (1972); *Barber* v. *Page,* 390 U. S. 719 (1968). See also *Motes* v. *United States,* 178 U. S. 458 (1900); *California* v. *Green,* 399 U. S., at 161–162, 165, 167, n. 16.[7]

The second aspect operates once a witness is shown to be unavailable. Reflecting its underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such trustworthiness that "there is no material departure from the reason of the general rule." *Snyder* v. *Massachusetts,* 291 U. S., at 107. The principle recently was formulated in *Mancusi* v. *Stubbs:*

> "The focus of the Court's concern has been to insure that there 'are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant,' *Dutton* v. *Evans, supra,* at 89, and to 'afford the trier of fact a satisfactory basis for evaluating

---

[7] A demonstration of unavailability, however, is not always required. In *Dutton* v. *Evans,* 400 U. S. 74 (1970), for example, the Court found the utility of trial confrontation so remote that it did not require the prosecution to produce a seemingly available witness. Cf. Read, The New Confrontation—Hearsay Dilemma, 45 S. Cal. L. Rev. 1, 43, 49 (1972); The Supreme Court, 1970 Term, 85 Harv. L. Rev. 3, 194–195, 197–198 (1971).

the truth of the prior statement,' *California* v. *Green, supra,* at 161. It is clear from these statements, and from numerous prior decisions of this Court, that even though the witness be unavailable his prior testimony must bear some of these 'indicia of reliability.' " 408 U. S., at 213.

The Court has applied this "indicia of reliability" requirement principally by concluding that certain hearsay exceptions rest upon such solid foundations that admission of virtually any evidence within them comports with the "substance of the constitutional protection." *Mattox* v. *United States,* 156 U. S., at 244.[8] This reflects the truism that "hearsay rules and the Confrontation Clause are generally designed to protect similar values," *California* v. *Green,* 399 U. S., at 155, and "stem from the same roots," *Dutton* v. *Evans,* 400 U. S. 74, 86 (1970). It also responds to the need for certainty in the workaday world of conducting criminal trials.

In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.[9]

---

[8] See, *e. g., Pointer* v. *Texas,* 380 U. S., at 407 (dying declarations); *Mattox* v. *United States,* 156 U. S., at 243–244 (same); *Mancusi* v. *Stubbs,* 408 U. S. 204, 213–216 (1972) (cross-examined prior-trial testimony); Comment, 30 La. L. Rev. 651, 668 (1970) ("Properly administered the business and public records exceptions would seem to be among the safest of the hearsay exceptions").

[9] The complexity of reconciling the Confrontation Clause and the hearsay rules has triggered an outpouring of scholarly commentary. Few observers have commented without proposing, roughly or in detail, a basic approach. Some have advanced theories that would shift the general mode of analysis in favor of the criminal defendant. See F. Heller, The Sixth

## III

We turn first to that aspect of confrontation analysis deemed dispositive by the Supreme Court of Ohio, and

Amendment 105 (1951); Seidelson, Hearsay Exceptions and the Sixth Amendment, 40 Geo. Wash. L. Rev. 76, 91–92 (1971) (all hearsay should be excluded except, perhaps, when prosecution shows absolute necessity, high degree of trustworthiness, and "total absence" of motive to falsify); The Supreme Court, 1967 Term, 82 Harv. L. Rev. 63, 237 (1968); Note, 31 Vand. L. Rev. 682, 694 (1978).

Others have advanced theories that would relax constitutional restrictions on the use of hearsay by the prosecutor. See 5 J. Wigmore, Evidence § 1397, p. 159 (J. Chadbourn rev. 1974); Note, The Confrontation Test for Hearsay Exceptions: An Uncertain Standard, 59 Calif. L. Rev. 580, 594 (1971) ("fixed procedural definition of the confrontation clause makes the actual protection afforded depend upon the particular evidence rules in force in each state"); Younger, Confrontation and Hearsay: A Look Backward, A Peek Forward, 1 Hofstra L. Rev. 32 (1973); Westen, The Future of Confrontation, 77 Mich. L. Rev. 1185 (1979); Graham, The Confrontation Clause, the Hearsay Rule, and the Forgetful Witness, 56 Texas L. Rev. 151 (1978); Note, 75 Yale L. J. 1434 (1966). See California v. Green, 399 U. S., at 172–189 (Harlan, J., concurring) (Confrontation Clause requires only that prosecution produce available witnesses; Due Process Clause bars conviction "where the critical issues at trial were supported only by ex parte testimony not subjected to cross-examination, and not found to be reliable by the trial judge," id., at 186, n. 20).

Still others have proposed theories that might either help or hurt the accused. See Graham, The Right of Confrontation and the Hearsay Rule: Sir Walter Raleigh Loses Another One, 8 Crim. L. Bull. 99, 129 (1972); Baker, The Right to Confrontation, the Hearsay Rules, and Due Process, 6 Conn. L. Rev. 529 (1974); Comment, 13 UCLA L. Rev. 366, 376–377 (1966) (advocating sliding-scale "probative value-need quotient"); Comment, 52 Texas L. Rev. 1167, 1190–1191 (1974).

Finally, a number of commentators, while sometimes criticizing particular results or language in past decisions, have generally agreed with the Court's present approach. See Davenport, The Confrontation Clause and The Co-Conspirator Exception in Criminal Prosecutions: A Functional Analysis, 85 Harv. L. Rev. 1378, 1405 (1972); Read, The New Confrontation-Hearsay Dilemma, 45 S. Cal. L. Rev. 1, 48 (1972) ("the traditional approach . . . with its recognition of a core constitutional value to be preserved, but with its reluctance to make sweeping declarations as to the

answered by it in the negative—whether Anita Isaacs' prior testimony at the preliminary hearing bore sufficient "indicia of reliability." Resolution of this issue requires a careful comparison of this case to *California* v. *Green, supra.*

## A

In *Green,* at the preliminary hearing, a youth named Porter identified Green as a drug supplier. When called to the stand at Green's trial, however, Porter professed a lapse of memory. Frustrated in its attempt to adduce live testimony, the prosecution offered Porter's prior statements. The trial judge ruled the evidence admissible, and substantial portions of the preliminary hearing transcript were read to the jury. This Court found no error. Citing the established rule that prior trial testimony is admissible upon retrial if the declarant becomes unavailable, *Mattox* v. *United States,* 156 U. S. 237 (1895); *Mancusi* v. *Stubbs,* 408 U. S. 204 (1972), and recent dicta suggesting the admissibility of preliminary hearing testimony under proper circumstances, *Barber* v. *Page,* 390 U. S., at 725–

---

meaning of that right . . . is the best . . . compromise"); Note, 113 U. Pa. L. Rev. 741, 748, and n. 38 (1965) (requiring "adequate substitute for confrontation," while recognizing that no substitute can be "fully adequate"). See also Natali, *Green, Dutton* and *Chambers:* Three Cases in Search of a Theory, 7 Rutgers-Camden L. J. 43, 62 (1975); The Supreme Court, 1970 Term, 85 Harv. L. Rev. 3, 199 (1971):

Notwithstanding this divergence of critical opinion, we have found no commentary suggesting that the Court has misidentified the basic interests to be accommodated. Nor has any commentator demonstrated that prevailing analysis is out of line with the intentions of the Framers of the Sixth Amendment. Convinced that "no rule will perfectly resolve all possible problems," Natali, 7 Rutgers-Camden L. J., at 73, we reject the invitation to overrule a near-century of jurisprudence. Our reluctance to begin anew is heightened by the Court's implicit prior rejection of principal alternative proposals, see *Dutton* v. *Evans,* 400 U. S., at 93–100 (concurring opinion), and *California* v. *Green,* 399 U. S., at 172–189 (concurring opinion); the mutually critical character of the commentary; and the Court's demonstrated success in steering a middle course among proposed alternatives.

726; *Pointer* v. *Texas*, 380 U. S., at 407, the Court rejected Green's Confrontation Clause attack. It reasoned:

"Porter's statement at the preliminary hearing had already been given under circumstances closely approximating those that surround the typical trial. Porter was under oath; respondent was represented by counsel—the same counsel in fact who later represented him at the trial; respondent had every opportunity to cross-examine Porter as to his statement; and the proceedings were conducted before a judicial tribunal, equipped to provide a judicial record of the hearings." 399 U. S., at 165.

These factors, the Court concluded, provided all that the Sixth Amendment demands: "substantial compliance with the purposes behind the confrontation requirement." *Id.*, at 166.[10]

---

[10] This reasoning appears in Part III of *Green,* the only section of that opinion directly relevant to the issue raised here. The Ohio court in the present case appears to have dismissed Part III as "dictum." 55 Ohio St. 2d, at 198, 378 N. E. 2d, at 497. The United States has suggested that Part III properly is viewed as an "alternative holding." Brief for United States as *Amicus Curiae* 24, n. 15. Either view, perhaps, would diminish *Green's* precedential significance. We accept neither.

In Part II of *Green,* the Court held that use of a trial witness' prior inconsistent statements as substantive evidence did not, as a general rule, violate the Confrontation Clause. In Part III, the Court went further and held: "Porter's preliminary hearing testimony was admissible . . . wholly apart from the question of whether respondent had an effective opportunity for confrontation at the subsequent trial. For Porter's statement at the preliminary hearing had already been given under circumstances closely approximating those that surround the typical trial." 399 U. S., at 165. In Part IV, the Court returned to the general rule articulated in Part II. The Court contrasted cases in which the declarant testifies at trial that he has forgotten the underlying events, rather than claiming recollection but advancing an inconsistent story. The Court noted that commentators disagreed over whether the former class of cases should be brought within the general rule articulated in Part II. *Id.*, at 169, n. 18. Given the difficulty of the issue, which was neither briefed in this Court nor addressed below, the Court remanded the case for a determination of whether assertedly inconsistent remarks made by Porter to a police

This passage and others in the *Green* opinion suggest that the *opportunity* to cross-examine at the preliminary hearing— even absent actual cross-examination—satisfies the Confrontation Clause. Yet the record showed, and the Court recognized, that defense counsel in fact had cross-examined Porter at the earlier proceeding. *Id.,* at 151. Thus, MR. JUSTICE BRENNAN, writing in dissent, could conclude only that "[p]erhaps" "the mere opportunity for face-to-face encounter [is] sufficient." *Id.,* at 200, n. 8. See Note, 52 Texas L. Rev. 1167, 1170 (1974).

We need not decide whether the Supreme Court of Ohio correctly dismissed statements in *Green* suggesting that the mere opportunity to cross-examine rendered the prior testimony admissible. See Westen, The Future of Confrontation, 77 Mich. L. Rev. 1185, 1211 (1979) (issue is "truly difficult to resolve under conventional theories of confrontation"). Nor need we decide whether *de minimis* questioning is sufficient, for defense counsel in this case tested Anita's testimony with the equivalent of significant cross-examination.

## B

Counsel's questioning clearly partook of cross-examination as a matter of *form*. His presentation was replete with leading questions,[11] the principal tool and hallmark of cross-

---

officer could be admitted under the rule of Part II. Since the critical reason for this disposition was Porter's asserted forgetfulness at trial, the same result clearly would have obtained in regard to Porter's preliminary hearing testimony were it not for the Court's holding in Part III. It follows that Part III was not an alternative holding, and certainly was not dictum. That portion of the opinion alone dispositively established the admissibility of Porter's preliminary hearing testimony. See also Note, 59 Calif. L. Rev., at 589; The Supreme Court, 1969 Term, 84 Harv. L. Rev. 1, 114–115 (1970).

[11] No less than 17 plainly leading questions were asked, as indicated by phrases in counsel's inquiries: "is[n't] it a fact . . . that"; "is it to your knowledge, then, that . . ."; "is[n't] that correct"; "you never gave them . . ."; "this wasn't then in the pack . . ."; "you have never [not] seen [discussed; talked] . . ."; "you never gave. . . ."

examination. In addition, counsel's questioning comported with the principal *purpose* of cross-examination: to challenge "whether the declarant was sincerely telling what he believed to be the truth, whether the declarant accurately perceived and remembered the matter he related, and whether the declarant's intended meaning is adequately conveyed by the language he employed." Davenport, The Confrontation Clause and the Co-Conspirator Exception in Criminal Prosecutions: A Functional Analysis, 85 Harv. L. Rev. 1378 (1972). Anita's unwillingness to shift the blame away from respondent became discernible early in her testimony. Yet counsel continued to explore the underlying events in detail. He attempted, for example, to establish that Anita and respondent were sharing an apartment, an assertion that was critical to respondent's defense at trial and that might have suggested ulterior personal reasons for unfairly casting blame on respondent. At another point, he directly challenged Anita's veracity by seeking to have her admit that she had given the credit cards to respondent to obtain a television. When Anita denied this, defense counsel elicited the fact that the only television she owned was a "Twenty Dollar . . . old model." App. 21. Cf. *Davis* v. *Alaska,* 415 U. S. 308, 316–317 (1974).

Respondent argues that, because defense counsel never asked the court to declare Anita hostile, his questioning necessarily occurred on direct examination. See *State* v. *Minneker,* 27 Ohio St. 2d 155, 271 N. E. 2d 821 (1971). But however state law might formally characterize the questioning of Anita, it afforded "substantial compliance with the purposes behind the confrontation requirement," *Green,* 399 U. S., at 166, no less so than classic cross-examination. Although Ohio law may have authorized objection by the prosecutor or intervention by the court, this did not happen. As in *Green,* respondent's counsel was not "significantly limited in any way in the scope or nature of his cross-examination." *Ibid.*

We are also unpersuaded that *Green* is distinguishable on the ground that Anita Isaacs—unlike the declarant Porter in *Green*—was not personally available for questioning *at trial*. This argument ignores the language and logic of *Green*:

> "Porter's statement would, we think, have been admissible at trial even in Porter's absence if Porter had been actually unavailable. . . . That being the case, we do not think a different result should follow where the witness is actually produced." *Id.*, at 165.

Nor does it matter that, unlike Green, respondent had a different lawyer at trial from the one at the preliminary hearing. Although one might strain one's reading of *Green* to assign this factor some significance, respondent advances no reason of substance supporting the distinction. Indeed, if we were to accept this suggestion, *Green* would carry the seeds of its own demise; under a "same attorney" rule, a defendant could nullify the effect of *Green* by obtaining new counsel after the preliminary hearing was concluded.

Finally, we reject respondent's attempt to fall back on general principles of confrontation, and his argument that this case falls among those in which the Court must undertake a particularized search for "indicia of reliability." Under this theory, the factors previously cited—absence of face-to-face contact at trial, presence of a new attorney, and the lack of classic cross-examination—combine with considerations uniquely tied to Anita to mandate exclusion of her statements. Anita, respondent says, had every reason to lie to avoid prosecution or parental reprobation. Her unknown whereabouts is explicable as an effort to avoid punishment, perjury, or self-incrimination. Given these facts, her prior testimony falls on the unreliable side, and should have been excluded.

In making this argument, respondent in effect asks us to disassociate preliminary hearing testimony previously subjected to cross-examination from previously cross-examined

prior-trial testimony, which the Court has deemed generally immune from subsequent confrontation attack. Precedent requires us to decline this invitation. In *Green* the Court found guarantees of trustworthiness in the accouterments of the preliminary hearing itself; there was no mention of the inherent reliability or unreliability of Porter and his story. See also *Mancusi* v. *Stubbs,* 408 U. S., at 216.

In sum, we perceive no reason to resolve the reliability issue differently here than the Court did in *Green.* "Since there was an adequate opportunity to cross-examine [the witness], and counsel . . . availed himself of that opportunity, the transcript . . . bore sufficient 'indicia of reliability' and afforded ' "the trier of fact a satisfactory basis for evaluating the truth of the prior statement." ' " 408 U. S., at 216.[12]

---

[12] We need not consider whether defense counsel's questioning at the preliminary hearing surmounts some inevitably nebulous threshold of "effectiveness." In *Mancusi,* to be sure, the Court explored to some extent the adequacy of counsel's cross-examination at the earlier proceeding. See 408 U. S., at 214–215. That discussion, however, must be read in light of the fact that the defendant's representation at the earlier proceeding, provided by counsel who had been appointed only four days prior thereto, already had been held to be ineffective. See *id.,* at 209. Under those unusual circumstances, it was necessary to explore the character of the actual cross-examination to ensure that an adequate opportunity for full cross-examination had been afforded to the defendant. Cf. *Pointer* v. *Texas,* 380 U. S., at 407. We hold that in all but such extraordinary cases, no inquiry into "effectiveness" is required. A holding that every case involving prior testimony requires such an inquiry would frustrate the principal objective of generally validating the prior-testimony exception in the first place—increasing certainty and consistency in the application of the Confrontation Clause.

The statement in *Mancusi* quoted in the text indicates the propriety of this approach. To the same effect is *Mattox* v. *United States,* 156 U. S., at 244 ("The substance of the constitutional protection is preserved to the prisoner in the advantage he has once had of seeing the witness face to face, and of subjecting him to the ordeal of a cross-examination").

## IV

Our holding that the Supreme Court of Ohio erred in its "indicia of reliability" analysis does not fully dispose of the case, for respondent would defend the judgment on an alternative ground. The State, he contends, failed to lay a proper predicate for admission of the preliminary hearing transcript by its failure to demonstrate that Anita Isaacs was not available to testify in person at the trial. All the justices of the Supreme Court of Ohio rejected this argument. 55 Ohio St. 2d, at 195 and 199, 378 N. E. 2d, at 495 and 497.

## A

The basic litmus of Sixth Amendment unavailability is established: "[A] witness is not 'unavailable' for purposes of . . . the exception to the confrontation requirement unless the prosecutorial authorities have made a *good-faith effort* to obtain his presence at trial." *Barber* v. *Page,* 390 U. S., at 724–725 (emphasis added). Accord, *Mancusi* v. *Stubbs, supra; California* v. *Green,* 399 U. S., at 161–162, 165, 167, n. 16; *Berger* v. *California,* 393 U. S. 314 (1969).

Although it might be said that the Court's prior cases provide no further refinement of this statement of the rule, certain general propositions safely emerge. The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation. "The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness." *California* v. *Green,* 399 U. S., at 189, n. 22 (concurring opinion, citing *Barber* v. *Page, supra*). The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness. As with other evi-

dentiary proponents, the prosecution bears the burden of establishing this predicate.

## B

On the facts presented we hold that the trial court and the Supreme Court of Ohio correctly concluded that Anita's unavailability, in the constitutional sense, was established.

At the *voir dire* hearing, called for by the defense, it was shown that some four months prior to the trial the prosecutor was in touch with Amy Isaacs and discussed with her Anita's whereabouts. It may appropriately be inferred that Mrs. Isaacs told the prosecutor essentially the same facts to which she testified at *voir dire:* that the Isaacs had last heard from Anita during the preceding summer; that she was not then in San Francisco, but was traveling outside Ohio; and that the Isaacs and their other children knew of no way to reach Anita even in an emergency. This last fact takes on added significance when it is recalled that Anita's parents earlier had undertaken affirmative efforts to reach their daughter when the social worker's inquiry came in from San Francisco. This is not a case of parents abandoning all interest in an absent daughter.

The evidence of record demonstrates that the prosecutor issued a subpoena to Anita at her parents' home, not only once, but on five separate occasions over a period of several months. In addition, at the *voir dire* argument, the prosecutor stated to the court that respondent "witnessed that I have attempted to locate, I have subpoenaed, there has been a *voir dire* of the witness' parents, and they have not been able to locate her for over a year." App. 12.

Given these facts, the prosecution did not breach its duty of good-faith effort. To be sure, the prosecutor might have tried to locate by telephone the San Francisco social worker with whom Mrs. Isaacs had spoken many months before and might have undertaken other steps in an effort to find Anita. One, in hindsight, may always think of other things. Never-

theless, the great improbability that such efforts would have resulted in locating the witness, and would have led to her production at trial, neutralizes any intimation that a concept of reasonableness required their execution. We accept as a general rule, of course, the proposition that "the possibility of a refusal is not the equivalent of asking and receiving a rebuff." *Barber* v. *Page,* 390 U. S., at 724, quoting from the dissenting opinion in that case in the Court of Appeals (381 F. 2d 479, 481 (CA10 1966)). But the service and ineffectiveness of the five subpoenas and the conversation with Anita's mother were far more than mere reluctance to face the possibility of a refusal. It was investigation at the last-known real address, and it was conversation with a parent who was concerned about her daughter's whereabouts.

*Barber* and *Mancusi* v. *Stubbs, supra,* are the cases in which this Court has explored the issue of constitutional unavailability. Although each is factually distinguishable from this case, *Mancusi* provides significant support for a conclusion of good-faith effort here,[13] and *Barber* has no contrary significance. Insofar as this record discloses no basis for concluding that Anita was abroad, the case is factually weaker than *Mancusi;* but it is stronger than *Mancusi* in the sense that the Ohio prosecutor, unlike the prosecutor in *Mancusi,* had no clear indication, if any at all, of Anita's whereabouts. In *Barber,* the Court found an absence of good-faith effort where

---

[13] In *Mancusi,* the declarant "who had been born in Sweden but had become a naturalized American citizen, had returned to Sweden and taken up permanent residence there." 408 U. S., at 209. While in this country, he had testified against Stubbs at his Tennessee trial for murder and kidnaping. Stubbs was convicted, but obtained habeas corpus relief 10 years later, and was retried by Tennessee. Before the second trial, the prosecution sent a subpoena to be served in Texas, the declarant's last place of residence in this country. It could not be served. The Court rejected Stubbs' assertion that the prosecution had not undertaken good-faith efforts in failing to do more. "Tennessee . . . was powerless to compel his attendance . . . either through its own process or through established procedures." *Id.,* at 212.

the prosecution made no attempt to secure the presence of a declarant incarcerated in a federal penitentiary in a neighboring State. There, the prosecution knew where the witness was, procedures existed whereby the witness could be brought to the trial, and the witness was not in a position to frustrate efforts to secure his production. Here, Anita's whereabouts were not known, and there was no assurance that she would be found in a place from which she could be forced to return to Ohio.

We conclude that the prosecution carried its burden of demonstrating that Anita was constitutionally unavailable for purposes of respondent's trial.

The judgment of the Supreme Court of Ohio is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL and MR. JUSTICE STEVENS join, dissenting.

The Court concludes that because Anita Isaacs' testimony at respondent's preliminary hearing was subjected to the equivalent of significant cross-examination, such hearsay evidence bore sufficient "indicia of reliability" to permit its introduction at respondent's trial without offending the Confrontation Clause of the Sixth Amendment. As the Court recognizes, however, the Constitution imposes the threshold requirement that the prosecution must demonstrate the unavailability of the witness whose prerecorded testimony it wishes to use against the defendant. Because I cannot agree that the State has met its burden of establishing this predicate, I dissent.[1]

[1] Because I am convinced that the State failed to lay a proper foundation for the admission of Anita Isaacs' preliminary hearing testimony, I have no occasion to consider whether that testimony had in fact been subjected to full and effective adverse questioning and whether, even conceding the adequacy of the prior cross-examination, the significant dif-

"There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer* v. *Texas,* 380 U. S. 400, 405 (1965). Accord, *Berger* v. *California,* 393 U. S. 314, 315 (1969); *Barber* v. *Page,* 390 U. S. 719, 721 (1968); *Pointer* v. *Texas, supra,* at 410 (STEWART, J., concurring); *Kirby* v. *United States,* 174 U. S. 47, 55–56 (1899). Historically, the inclusion of the Confrontation Clause in the Bill of Rights reflected the Framers' conviction that the defendant must not be denied the opportunity to challenge his accusers in a direct encounter before the trier of fact. See *California* v. *Green,* 399 U. S. 149, 156–158 (1970); *Park* v. *Huff,* 506 F. 2d 849, 861–862 (CA5 1975) (Gewin, J., concurring). At the heart of this constitutional guarantee is the accused's right to compel the witness "to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Mattox* v. *United States,* 156 U. S. 237, 242–243 (1895). See also *California* v. *Green, supra,* at 174–183 (Harlan, J., concurring).

Despite the literal language of the Sixth Amendment,[2] our cases have recognized the necessity for a limited exception to the confrontation requirement for the prior testimony of a witness who is unavailable at the defendant's trial. In keeping with the importance of this provision in our constitutional scheme, however, we have imposed a heavy burden on the prosecution either to secure the presence of the witness or to

---

ferences in the nature and objectives of the preliminary hearing and the trial preclude substituting confrontation at the former proceeding for the constitutional requirement of confrontation at the latter. See *California* v. *Green,* 399 U. S. 149, 195–203 (1970) (BRENNAN, J., dissenting).

[2] "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."

demonstrate the impossibility of that endeavor. *Barber* v. *Page, supra,* held that the absence of a witness from the jurisdiction does not excuse the State's failure to attempt to compel the witness' attendance at trial; in such circumstances, the government must show that it has engaged in a diligent effort to locate and procure the witness' return. "In short, a witness is not 'unavailable' for purposes of the foregoing exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." *Id.,* at 724–725. See, *e. g., United States* v. *Mann,* 590 F. 2d 361, 367 (CA1 1978); *United States* v. *Lynch,* 163 U. S. App. D. C. 6, 18–19, 499 F. 2d 1011, 1023–1024 (1974); *Government of the Virgin Islands* v. *Aquino,* 378 F. 2d 540, 549–552 (CA3 1967). See generally 5 J. Wigmore, Evidence § 1405 (J. Chadbourn rev. 1974) and cases cited therein.

In the present case, I am simply unable to conclude that the prosecution met its burden of establishing Anita Isaacs' unavailability. From all that appears in the record—and there has been no suggestion that the record is incomplete in this respect—the State's *total* effort to secure Anita's attendance at respondent's trial consisted of the delivery of five subpoenas in her name to her parents' residence, and three of those were issued after the authorities had learned that she was no longer living there.[3] At least four months before the trial began, the prosecution was aware that Anita had moved away; yet during that entire interval it did nothing whatsoever to try to make contact with her. It is difficult to believe that the State would have been so derelict in attempting to secure the witness' presence at trial had it not had her

___

[3] The five subpoenas, all of which were issued to Anita at her parents' address, showed that returns were made on November 3 and 4, 1975, December 10, 1975, February 3, 1976, and February 25, 1976, respectively. During the course of the *voir dire* of Anita's mother, the prosecutor indicated that sometime in November 1975 the Isaacs had told him that Anita had left home. See Tr. 197; *ante,* at 75.

favorable preliminary hearing testimony upon which to rely in the event of her "unavailability." The perfunctory steps which the State took in this case can hardly qualify as a "good-faith effort." In point of fact, it was no effort at all.

The Court, however, is apparently willing to excuse the prosecution's inaction on the ground that any endeavor to locate Anita Isaacs was unlikely to bear fruit. See *ante,* at 75–76. I not only take issue with the premise underlying that reasoning—that the improbability of success can condone a refusal to conduct even a cursory investigation into the witness' whereabouts—but I also seriously question the Court's conclusion that a bona fide search in the present case would inevitably have come to naught.

Surely the prosecution's mere speculation about the difficulty of locating Anita Isaacs cannot relieve it of the obligation to attempt to find her. Although the rigor of the undertaking might serve to palliate a failure to prevail, it cannot justify a failure even to try. Just as *Barber* cautioned that " 'the possibility of a refusal is not the equivalent of asking and receiving a rebuff,' " 390 U. S., at 724 (quoting the decision below, 381 F. 2d 479, 481 (CA10 1966) (Aldrich, J., dissenting)), so, too, the possibility of a defeat is not the equivalent of pursuing all obvious leads and returning empty-handed. The duty of "good-faith effort" would be meaningless indeed "if that effort were required only in circumstances where success was guaranteed." *Mancusi* v. *Stubbs,* 408 U. S. 204, 223 (1972) (MARSHALL, J., dissenting).

Nor do I concur in the Court's bleak prognosis of the likelihood of procuring Anita Isaacs' attendance at respondent's trial.[4] Although Anita's mother testified that she had no

---

[4] In attempting to distinguish this case from *Barber* v. *Page,* 390 U. S. 719 (1968), and demonstrate the reasonableness of the State's conduct, the Court states that "there was no assurance that [Anita] would be found in a place from which she could be forced to return to Ohio." *Ante,* at 77. Once located, however, it is extremely unlikely that Anita could have resisted the State's efforts to secure her return. The Uniform

current knowledge of her daughter's whereabouts, the prosecution possessed sufficient information upon which it could have at least initiated an investigation. As the Court acknowledges, one especially promising lead was the San Francisco social worker to whom Mrs. Isaacs had spoken and with whom Anita had filed for welfare. What the Court fails to mention, however, is that the prosecution had more to go on than that datum alone. For example, Mrs. Isaacs testified that on the same day she talked to the social worker, she also spoke to her daughter. And although Mrs. Isaacs told defense counsel that she knew of no way to get in touch with her daughter in an emergency, Tr. 195, in response to a similar question from the prosecutor she indicated that someone in Tucson might be able to contact Anita. *Id.*, at 198–199. It would serve no purpose here to essay an exhaustive catalog of the numerous measures the State could have taken in a diligent attempt to locate Anita. It suffices simply to note that it is not "hindsight," see *ante*, at 75, that permits us to envision how a skilled investigator armed with this information (and any additional facts not brought out through the *voir dire*) [5] might have discovered Anita's whereabouts

Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings enables prosecuting authorities in one State to obtain an order from a court in another State compelling the witness' appearance to testify in court in the first State. The Uniform Act has been adopted in the District of Columbia, the Panama Canal Zone, Puerto Rico, the Virgin Islands, and every State in the Union except Alabama. 11 U. L. A. 1 (Supp. 1980).

[5] The Court of Appeals of Ohio expressed some doubt as to whether Mrs. Isaacs had been totally forthcoming in professing no knowledge of the whereabouts of her daughter, who had been linked to respondent's criminal involvements and who, in Mrs. Isaacs' words, "wants to make her own way, and forget all the unpleasantness that happened here, and prove something to herself and to us, and to think about her future and forget her past." Tr. 195–196. See App. 5–6. These reservations about the candidness of Mrs. Isaacs' testimony provide yet another reason why the State was not justified in relying solely on the Isaacs' representations to establish Anita's unavailability.

with reasonable effort. Indeed, precisely because the prosecution did absolutely nothing to try to locate Anita, hindsight does not enhance the vista of investigatory opportunities that were available to the State had it actually attempted to find her.

In sum, what the Court said in *Barber* v. *Page,* 390 U. S., at 725, is equally germane here: "[S]o far as this record reveals, the sole reason why [the witness] was not present to testify in person was because the State did not attempt to seek [her] presence. The right of confrontation may not be dispensed with so lightly."