**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Vernell MITCHELL, Defendant–Appellant.**

**No. 90CA0247.**

Colorado Court of Appeals, Div. II.

June 20, 1991.

Rehearing Denied Dec. 12, 1991.

Certiorari Denied May 11, 1992.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Robert Mark Russel, First Asst. Atty. Gen., Denver, for plaintiff-appellee.

Richard M. Crane, Denver, for defendant-appellant.

Opinion by Judge METZGER.

Defendant, Vernell Mitchell, appeals two judgments of conviction for first-degree murder entered on a jury verdict. We affirm.

At approximately 1:30 a.m., on April 23, 1978, a neighbor of Linda Gillespie and Gregory McGuire awoke to the sound of five or six gunshots, but did not investigate further. Later that morning, the bodies of Linda and Gregory were found under a bridge nearby. Both had been shot with a .38 caliber handgun.

Linda had previously been in a relationship with defendant, and when it ended earlier that year, defendant had threatened to kill Linda if he ever caught her with another man. This fact and other incriminating circumstances led police to focus on defendant as a suspect.

These circumstances included the fact that the bullets recovered from the victims' bodies were similar to a bullet which had been fired through Linda Gillespie's window a few weeks earlier. And, a Robert Martel told police that defendant had attempted to hire him "to kill a former girlfriend."

However, defendant told police he had been at his sister and brother-in-law's home until 9:30 p.m., and then had spent the balance of the night with his new girlfriend. Because defendant's alibi was corroborated by his girlfriend, he was not charged. The investigation was thereafter suspended, and the murders remained unsolved.

Eleven years later, in the course of a police re-investigation of the unsolved murders, the girlfriend who had provided defendant with an alibi was interviewed. She told the interviewing officer that defendant had not arrived at her home at 9:30 p.m. on April 22, 1978, as she had stated earlier. Rather, he had arrived much later, was shaking, and seemed to be very nervous. In the morning, he told her that, if she was asked, she was to say that he had been with her all night.

Based on this and other new evidence, defendant was charged with two counts of first-degree murder in the two 1978 deaths.

At trial, the court admitted as excited utterances, pursuant to CRE 803(2), evidence concerning two statements Linda Gillespie had made before her death. Neither of these statements had been given to police during the initial homicide investigation; both resulted from the renewed inquiry conducted some 11 years later.

The first statement, which was related to the jury by Linda's mother, involved actions of the defendant which had occurred a few months before the murder. The mother testified that Linda had told her

that defendant was waiting outside a classroom at Denver Opportunity School. When Linda exited the classroom, he confronted her with a handgun and threatened to kill her. Linda's mother testified that this information was relayed to her at Opportunity School within several minutes of the occurrence of the incident and that her daughter was "crying very hard" and seemed to be afraid.

The second statement was related to the jury by Linda's daughter, who was eight years old at the time of her mother's death. She testified that, a few weeks before the murder, two gunshots were fired through a window at their home and that her mother peeked out the window and screamed that it was the defendant she saw.

Defendant was convicted of two counts of first-degree murder and was sentenced accordingly.

## I.

■ Defendant concedes that Linda Gillespie's statements qualify as excited utterances pursuant to CRE 803(2). However, he contends their admission violated his right to confront witnesses pursuant to the Sixth Amendment and Colo. Const. art. II, § 16. Specifically, he argues that the trial court erred by failing to make any findings whether the statements bore sufficient indicia of reliability to be admissible. Asserting that the statements did not contain such indicia, he maintains that their admission constituted reversible error. We disagree.

In *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Supreme Court established a two-part test to be used in analyzing federal confrontation clause challenges. Our supreme court adopted this framework in its analysis of Colo. Const. art. II, § 16, confrontation challenges in *People v. Dement*, 661 P.2d 675 (Colo.1983).

First, because the confrontation clause reflects a preference for face-to-face accusation, the prosecution bears a burden either to produce the hearsay declarant for cross-examination or to demonstrate his or

her unavailability at trial. *Ohio v. Roberts, supra.* Obviously, here, the declarant was unavailable.

If unavailability is established, then only evidence bearing sufficient indicia of reliability is admissible. "In other words, if the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility, then the hearsay rule does not bar admission of the statement at trial." *Idaho v. Wright,* 497 U.S. ——, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). This rule is designed to assure that there is no material departure from the purpose underlying the confrontation right to augment accuracy in the factfinding process. *Ohio v. Roberts, supra.*

However, reliability of evidence falling within a firmly rooted hearsay exception resting upon solid foundations may be inferred. *Ohio v. Roberts, supra.* The People argue that excited utterances constitute such an exception, and we agree.

The excited utterance exception was deduced initially by Wigmore from his analysis of *res gestae* cases. *See* 6 J. Wigmore, *Evidence* §§ 1745–1764 (3d ed. 1940), and "finds abundant support in the decided federal cases." J. Weinstein & M. Berger, *Weinstein's Evidence,* § 803(2)[01] (1990). *Res gestae* first came into common use in the early 1800's as a "convenient escape" from the hearsay objection. *See* 6 J. Wigmore, *Evidence* § 1767 (3d ed. 1940).

The rationale for the excited utterance exception, similar to that used in early *res gestae* cases, is that the declarant's powers of reflection and ability to fabricate or misrepresent the events observed are momentarily suspended while the declarant is under the stress of excitement from a startling event. *See People v. Dement, supra.*

Excited utterances withstand confrontation clause challenges because, as the Supreme Court noted in *Idaho v. Wright, supra:*

"The basis for the 'excited utterance' exception for example, is that such statements are given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation, and that therefore the circumstances surrounding the making of the statement provide sufficient assurance that the statement is trustworthy and that cross-examination would be superfluous."

Consequently, because of their historical efficacy and inherent guarantees of trustworthiness, we hold that excited utterances, as defined by CRE 803(2), are firmly rooted and have the "solid foundation" to which the Supreme Court in *Ohio v. Roberts, supra,* referred as permitting an inference of reliability. *See Harrison v. United States,* 435 A.2d 734 (D.C.App. 1981).

Thus, here, admission of Linda Gillespie's excited utterances both to her mother and her daughter comported with the confrontation clause and Colo. Const. art. II, § 16. The trial court was not required to make findings concerning the statements' reliability because, by their nature, they bore sufficient inherent reliability to be admissible without more.

## II.

Defendant next argues that reversal is warranted because the record fails to contain his express waiver of his right to testify. We reject this contention.

Out of the presence of the jury, the trial court gave defendant an advisement which thoroughly complied with the requirements of *People v. Curtis,* 681 P.2d 504 (Colo. 1984), and the defendant acknowledged that he understood the advisement. The trial court then asked defendant if he had made up his mind whether he would testify or not and the defendant said that he had. When the trial court then asked defendant what his decision was, defense counsel interrupted and indicated that the extent of defendant's prior criminal record was not clear and that a discussion with the prosecutor needed to be held. A luncheon recess then ensued.

After this recess, at defense counsel's request, the parties engaged in a hearing outside the presence of the jury concerning the status of defendant's prior felony conviction. During the course of this hearing,

the presence of two jurors in the back of the courtroom was noted, and defendant's attorney moved for a mistrial and for dismissal. The trial court denied the dismissal motion and took the motion for mistrial under advisement. It determined that, if the jury returned with a guilty verdict, it would examine each of these jurors separately to determine whether they had overheard any of the proceedings in question. Neither defendant nor his attorney stated that that decision would have any effect on defendant's decision to testify or not.

Without any further colloquy between the court and defendant, the trial resumed, and defense counsel called several witnesses to testify. The defense rested without defendant having testified, and the trial court made no further inquiry of defendant concerning his decision to testify. After the verdict, each of the jurors who had been in the courtroom during the hearing stated that they had heard none of the proceedings. Defendant argues for the first time on appeal that this chain of circumstances mandates reversal, contending that the trial court's failure to obtain a waiver of testimony on the record is reversible error. We disagree.

■■■ A trial court's determination that a defendant effectively waived his right to testify will be upheld if it is supported by competent evidence. *People v. Curtis, supra.* While the best means of demonstrating the defendant's state of mind are his own declarations on the record, *People v. Curtis, supra,* there is no rigid requirement that the trial court question the defendant to determine whether his waiver is truly voluntary. *Roelker v. People,* 804 P.2d 1336 (Colo.1991).

■■ In this case, competent evidence exists to support the trial court's determination that defendant understood his right to testify and voluntarily waived that right. Defendant was present during all of the events recited above and did not indicate any misunderstanding, confusion, or involuntariness. The record is devoid of any evidence that his decision not to testify was involuntary or was usurped by the conduct of his attorney or that of the trial court.

*Roelker v. People, supra.* Thus, because competent evidence exists in the record to support the trial court's determination, we will not elevate form over substance to find otherwise.

### III.

Defendant's final contention is that the 11–year delay in charging him violated his constitutional rights to due process and fundamental fairness. This contention is without merit.

■■■ There is no right to a speedy filing of criminal charges. *People v. Hutchinson,* 192 Colo. 204, 557 P.2d 376 (1976). To have charges dismissed because of a delay, a defendant must show a violation of due process, that is, that the delay caused substantial and actual prejudice to his right to a fair trial. *People v. Hutchinson, supra.* That point is reached when the prejudice to the defendant caused by the delay, because of faded memories of parties and witnesses, loss of contact with witnesses, and loss of documents, becomes so great that due process and fundamental fairness require that the charges be dropped. *People v. Hall,* 729 P.2d 373 (Colo.1986).

[7] General allegations of prejudice are insufficient; a defendant must make a "specific showing of prejudice." *People v. Hutchinson, supra.* In determining whether the showing has been made, several factors should be examined: "(1) loss of defense witnesses; (2) whether the delay was purposeful and intended to prejudice the defendant; (3) the kind and quantum of evidence available to the prosecution; and (4) general considerations of justice and fair play." *People v. Hall, supra.*

■■■ A review of the these factors as applied to the facts here indicates that, as the trial court found, the defendant did not suffer prejudice or a violation of due process.

First, although two potential defense witnesses, defendant's sister and brother-in-law, had died during the 11–year interval, they could not have testified concerning the critical time when the murders are believed

to have occurred. If they had testified consistently with their 1978 statements, they could only have addressed the defendant's whereabouts until 7:00 p.m. on April 22. But, the prosecution's theory, supported by substantial evidence, was that the murders took place at approximately 1:30 a.m. the next morning, and defendant claimed to have been with his girlfriend at that time. Additionally, the brother-in-law's 1978 statement was admitted at trial, thus mitigating any alleged prejudice to defendant.

Second, defendant has conceded that the delay was not purposeful or intended to prejudice him.

Third, although circumstantial, the prosecution's evidence was sufficient to sustain a conviction. Even in the absence of eye-witnesses, the evidence against the defendant was consistent and compelling. It included threats against Linda Gillespie if she became involved with another man, a report that defendant had attempted to hire a person "to kill a former girlfriend," defendant's purchase of a .38 caliber gun not long before the murders, defendant's firing of .38 caliber bullets through Linda's window shortly before the murders, and the similarity between these bullets and those found in the victims' bodies.

Since defendant has not shown prejudice caused by the lapse of time between the murders and the filing of charges against him, justice and fair play mandate that he be tried for his crimes. Defendant's own actions caused the delay; the evidence at trial was unequivocal that he would have been charged 11 years earlier absent the false alibi supplied at his behest by his girlfriend.

The judgment is affirmed.

SMITH and MARQUEZ, JJ., concur.