State v. West

---

STATE OF NORTH CAROLINA v. PEARL ALFREDA WEST

No. 844SC1184

(Filed 3 September 1985)

1. **Criminal Law § 40— unavailable witness—testimony at preliminary hearing— recollection by investigating officer**

A detective was not incompetent to give his recollection of the preliminary hearing testimony of a witness who was unavailable for the trial because the detective served as an investigating officer in the case. Furthermore, defendant's opportunity to cross-examine the witness at the preliminary hearing satisfied defendant's rights of confrontation and cross-examination.

2. **Homicide § 21.7— second degree murder—insufficient evidence**

The evidence was insufficient to support a finding that defendant suffocated a child so as to support her conviction of second degree murder where the State's evidence was entirely circumstantial and showed that defendant and the child's mother both had the opportunity and motive to suffocate the child but failed to show that defendant in fact did so.

APPEAL by defendant from *Pope, Judge*. Judgment entered 14 April 1984 in Superior Court, DUPLIN County. Heard in the Court of Appeals 26 August 1985.

---

Defendant Pearl West was charged with the first degree murder of Jason Lamar Fillyow, a two-year-old child, on 9 February 1984. The trial was conducted as a capital trial. The trial judge instructed the jury on first degree murder and the lesser-included offense of second degree murder. The jury convicted defendant of second degree murder. After finding one aggravating factor and five mitigating factors, the trial judge sentenced the defendant to twenty-five years in prison.

The State's evidence tended to show that defendant's husband, Carlton West, began having an affair with Ingenue Fillyow, an unmarried teenager and mother of Jason Fillyow, sometime before Christmas, 1983. When defendant became aware of the affair, she confronted her husband and Ingenue. Shortly thereafter, she took her five children with her and moved from Wallace, North Carolina, where defendant and her husband lived, to Washington, D.C. Once defendant left, Ingenue and her son moved into defendant's house.

A few days later, on 7 February 1984, Carlton West drove to Washington, apparently seeking reconciliation with his wife. He stayed one night with defendant in a hotel, but the two argued the next morning and defendant took Carlton's car, leaving him stranded. He went back to North Carolina.

On 9 February 1984 defendant borrowed a friend's car and drove to North Carolina. She stopped in Warsaw and called her husband. She did not tell him she was in North Carolina. He told her he was not with Ingenue, and started to pray with her on the phone. Defendant became upset and hung up. Twenty minutes later, she arrived at her house, where Carlton and Ingenue were staying.

At trial, there were three sources of evidence as to what happened when defendant arrived at the house: Ingenue's trial testimony, the testimony of a police officer as to how defendant's husband testified at the preliminary hearing, and defendant's trial testimony. Defendant's husband refused to testify at trial, invoking the spousal privilege.

Ingenue Fillyow testified that on the evening of 9 February 1984 she was at Carlton West's house when he received a phone call from his wife, the defendant. About fifteen minutes later, she

heard the door open and Carlton said, "It's Pearl" and "Get in the closet." She went to the closet in the TV room and got in it. Jason was in the TV room, watching television.

From the bedroom closet, Ingenue heard Pearl say a number of times, "Where is she?" She heard Carlton say, "She's outside" and "Go outside and get her." Then she heard noises, as though, in her testimony, someone was fighting, coming from the TV room. She heard Pearl say, "Let me go," and she could hear Jason screaming.

She looked out of the closet and saw Jason lying on the bed, on his stomach, with his hands under his chin, but didn't notice him moving at all. Later, Pearl entered the bedroom and went to the closet door. Ingenue came out of the closet and the two had a struggle. Finally, Ingenue pushed Pearl against a dresser and ran out of the room. When she ran out, Jason was still on the bed. When asked if he was alive or dead or asleep, she said, "I wouldn't say he was dead."

The State presented Deputy Sheriff Jimmy Smith, who testified as to his recollection of Carlton West's testimony at the preliminary hearing. Smith said that Carlton testified that when his wife arrived on the evening of 9 February 1984, she came into the house and began looking for Ingenue. Defendant opened the door of the TV room and said "Where is she?" Carlton answered, "Outside" and "Come on. I'll get her," and walked to the kitchen door, hoping Pearl would follow him outside. He heard Jason screaming and returned to the TV room, where he saw Jason in a chair and Pearl "on top of him with a black object over his head." He took the object, which he said could have been a coat.

Pearl then grabbed the child by the neck, and he (Carlton) grabbed her. Pearl took hold of the boy by his body. Carlton then freed the child and told it to run outside. He held Pearl on the floor in order for Ingenue and Jason to get outside. He said that she was in an hysterical, emotional state.

When he thought Ingenue and the boy had gotten outside, Carlton left the TV room and went out the kitchen door. He heard Ingenue screaming and started back inside, but Ingenue ran past him outside. Carlton followed her. Although Ingenue told him the boy was inside, he did not think defendant would hurt the boy.

Out of fear of defendant, the two went deep into the woods and did not return for 2½ hours. When they returned, they found Jason dead, lying on his back on the bed.

Defendant testified that she went into the house, met her husband, and, on realizing Ingenue was there, struggled with him. She stated that she saw Jason in the TV room and, when her husband wrestled her to the ground, she grabbed Jason by the pants and then put her arm around him, holding him to her. When her husband started choking her, and she bit him, she let go of Jason. Defendant testified that her husband then shoved her to the floor and held her there while she screamed "Let me go." After eight to ten minutes, he jumped up and ran out the kitchen door.

She then went into the bedroom, saw Jason lying on the bed, and saw Ingenue's black coat, indicating to her that Ingenue was in the room. Defendant went to the closet door, and Ingenue emerged screaming and flailing her hands, knocking the closet door off its runners and down on the bed. Defendant then fought with Ingenue for five or six minutes, during which time she did not notice Jason moving or making a sound. Defendant testified that she then followed Ingenue and her husband out of the house, but then returned when she realized she didn't have her keys. After finding her car key on the floor of the bedroom, she saw the closet door lying slantwise against the bed, and underneath it, was the child Jason. When he did not respond to her call, she shook him, but got no response. Frightened, and thinking that Ingenue and Carlton would return as soon as she was gone, she left, so they could come back and see about the child.

The medical evidence showed that the child died by suffocation. He had a small abrasion on his neck under his jaw, but had no other abrasions or bruises.

The trial judge refused to instruct on voluntary manslaughter or involuntary manslaughter.

From a judgment of guilty of second degree murder and a sentence of twenty-five years in prison, the defendant appeals.

*Attorney General Lacy H. Thornburg, by Assistant Attorney General Lucien Capone III, for the State.*

*Appellate Defender Adam Stein, by Assistant Appellate Defender Robin E. Hudson, for defendant appellant.*

State v. West

ARNOLD, Judge.

[1] We first consider whether the trial judge should have excluded the testimony of Detective Jimmy Smith as to what Carlton West testified at the preliminary hearing of this case. Mr. West, defendant's husband, testified against his wife at the preliminary hearing, but avoided testifying against her at trial by claiming the privilege of not testifying against his spouse. The trial judge found defendant's husband to be an unavailable witness, and allowed his prior testimony to be admitted under the former testimony exception to the hearsay rule. The defendant does not challenge the finding that defendant's husband was an unavailable witness, but contends that the court committed prejudicial error by allowing Detective Smith, who was an investigating officer, assisting the prosecution, to give his recollection of Carlton West's testimony at the preliminary hearing.

We agree that Detective Smith, who served as an investigating officer in the case, may not have been the best source of Carlton West's former testimony. Yet, we find no authority for ruling that because Detective Smith was otherwise providing evidence for the State his testimony was incompetent as a matter of law. In general, any first-hand observer of the giving of former testimony is qualified to testify to its purport from his unaided memory. *See* McCormick on Evidence § 260 (3rd ed. 1984). Any potential bias or tendency to confuse the testimony with other accounts of the crime can be exposed by cross-examination, and goes to credibility, which is the jury's province to determine.

The giving of former testimony does not infringe the defendant's constitutional rights to confrontation and cross-examination if the defendant is present and represented by counsel, and if he has an adequate opportunity to cross-examine the witness. *See Ohio v. Roberts*, 448 U.S. 56, 65 L.Ed. 2d 597, 100 S.Ct. 2531 (1980). Our review of North Carolina's preliminary hearing statute and case law convinces us that it assures an opportunity for cross-examination adequate to fulfill the requirements of our state and federal confrontation clauses. The record indicates the defendant and her attorney were present at the preliminary hearing.

We conclude that the trial court did not err by admitting Carlton West's former testimony as recalled by Detective Smith.

[2] The next, and most crucial, question in this case is whether, given the admissibility of Carlton West's former testimony, there was sufficient evidence to convict defendant of second degree murder. In deciding this question, we must consider the evidence in the light most favorable to the State, and determine whether it substantially supports a finding that the offense charged has been committed and that defendant has committed it. "[I]f the evidence is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator," then the motion to dismiss for insufficiency of the evidence should have been granted. *State v. Bates*, 309 N.C. 528, 533, 308 S.E. 2d 258, 262 (1983).

Here, as to whether the defendant committed the crime charged, the State's evidence is entirely circumstantial. Two persons had the opportunity and motive to have covered the child's mouth and suffocated it: defendant, who out of rage with Ingenue, the child's mother, may have killed the child after Ingenue ran from the house, and Ingenue, who was hiding in the bedroom and was alone with the child in the bedroom after it came screaming in to her, and out of fright may have covered its mouth to quiet it, and accidentally suffocated it. Carlton West's former testimony, that he saw the defendant in the TV room with a black object over the child's head and later that defendant grabbed the child's neck, supports a finding that defendant had malice towards the child and intent to harm and possibly to kill the child, but it does not tell us whether or not defendant in fact did kill the child. We can only speculate as to that crucial fact. Given this gap in the record, we cannot in conscience say that there is substantial evidence to support the finding that the defendant suffocated the child. The motion to dismiss for insufficiency of the evidence should have been granted.

We see no need to reach defendant's other contentions.

Reversed.

Chief Judge HEDRICK and Judge COZORT concur.