NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0282n.06

No. 09-1781

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**May 03, 2011**
LEONARD GREEN, Clerk

LEO KENNEDY,                              )
                                          )
        Petitioner-Appellant,             )
                                          )
v.                                        )    ON APPEAL FROM THE UNITED
                                          )    STATES DISTRICT COURT FOR THE
MILLICENT WARREN,                         )    EASTERN DISTRICT OF MICHIGAN
                                          )
        Defendant-Appellee.               )

Before: SUTTON and KETHLEDGE, Circuit Judges, and HOOD, District Judge.[*]

SUTTON, Circuit Judge. A Michigan jury convicted Leo Kennedy of first-degree murder

and felony firearm possession. The Michigan courts affirmed his conviction on direct appeal and

denied Kennedy's requests for state post-conviction relief. A federal district court denied Kennedy's

habeas petition, a decision we affirm because the state courts reasonably rejected the claims in the

petition.

I.

The State charged Kennedy and co-defendant Darnell Parham with the August 1999 murder

of Anthony "Tone" Mercer. At their joint trial, the prosecution put two eyewitnesses on the stand.

The first, Ronald Powell, testified that he saw Parham and Kennedy drive up to a nightclub and

_____

[*] The Honorable Joseph M. Hood, Senior United States District Judge for the Eastern
District of Kentucky, sitting by designation.

approach Mercer, after which Parham and Kennedy argued with Mercer, Parham "passed Leo [a] gun," and Kennedy shot Mercer four times. R.13-2 at 25. The second witness, Dawon Grier, testified that he saw Kennedy shoot Mercer and that Parham told Kennedy to shoot Mercer.

The defense sought to undercut these eyewitness accounts in a few ways. It pointed out that Powell did not identify Kennedy as the shooter at a preliminary examination hearing or in his initial statement to the police. And on cross-examination, it drew out that Grier "really didn't see who shot" Mercer. R.13-3 at 84. On re-direct examination, however, Grier said that he saw Kennedy shoot Mercer, adding that his contrary prior statements stemmed from concerns for the safety of his family.

The State called four other witnesses: Michael Dixon, Tederrian Jones, Deandre Frazier and Sennie Yeager. Dixon denied making a statement to the police and then, changing his story, insisted he could not recall the contents of that statement. The prosecutor impeached him with his signed police statement, which said Kennedy admitted to shooting Mercer.

Tederrian Jones, too, denied giving a statement to the police. The prosecutor took the same tack in response, impeaching Jones by reading his police statement to him. In the statement, Jones admitted that he, Parham and Kennedy sold drugs and competed for business with Mercer. The statement added that "everybody in the hood . . . kept saying everybody saw [Kennedy] shoot" Mercer, R.13-6 at 195, 206–07, and told the police (accurately) where to find the murder weapon—at

a third party's home. The prosecutor later introduced the weapon (a 9 mm pistol) into evidence, and showed the jury matching "Forever Real" tattoos on Jones, Frazier and Kennedy.

Frazier followed suit and testified that he did not make a statement to the police. The prosecution likewise impeached him with his police statement, which said Kennedy admitted to shooting Mercer.

Yeager also denied making a statement to the police, though she persisted more than the other witnesses, insisting she did not want to testify and requesting a lawyer before testifying further. She eventually testified that Parham and Kennedy told her that Kennedy shot Mercer.

The State also introduced Kennedy's police statement into evidence. In the statement, Kennedy admitted to riding in Parham's car on the night of the murder but denied shooting Mercer.

A jury convicted Kennedy of murder and felony firearm possession, and the court sentenced him to life in prison. Kennedy filed an application for leave to appeal in state court, arguing that he received ineffective assistance of counsel at trial. After the Michigan Court of Appeals and the Michigan Supreme Court denied his application, Kennedy filed a habeas petition in federal court. The district court stayed the ineffective-assistance claims and dismissed the other claims without prejudice so Kennedy could present them to the state courts. The state trial court denied each of these claims, including a Confrontation Clause claim, and the state appellate courts denied Kennedy's application for leave to appeal.

No. 09-1781
*Kennedy v. Warren*

The federal district court reopened the case and denied Kennedy's petition for habeas corpus. It denied Kennedy a certificate of appealability, though we granted him one on the ineffective-assistance and Confrontation Clause claims.

II.

Because Kennedy filed this petition after the effective date of the Antiterrorism and Effective Death Penalty Act, we may grant the writ with respect to claims "adjudicated on the merits in State court proceedings" only if the state court's adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). We agree with the parties that AEDPA deference applies to each of Kennedy's claims.

*Ineffective Assistance.* Kennedy maintains that his trial counsel performed below constitutional standards by failing to object to the admission of several statements at trial. To prevail, Kennedy must show that his attorney's performance was objectively unreasonable and that his attorney's failings so infected the proceedings as to make the trial unfair and the verdict unreliable. *See Strickland v. Washington*, 466 U.S. 668, 688 (1984). Because the state courts adjudicated these claims on the merits, "the question is not whether counsel's actions were

- 4 -

reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 788 (2011).

Kennedy's claim with respect to Yeager's testimony does not get off the ground. He forfeited the argument by failing to raise it before the district court.

The claim based on Grier's testimony fares no better. Kennedy claims his lawyer failed to object when "Grier testified that he had 'heard in the neighborhood' that Parham gave Kennedy a 'mission' to murder Mercer." Kennedy Br. at 17. But the circumstances surrounding this testimony are more nuanced than Kennedy lets on. On *direct* examination, Grier testified only that he told the police that Parham gave Kennedy a mission to kill Mercer, which is to say he described (and affirmed) the substance of his prior statements, as opposed to repeating what someone else said, making it inappropriate to object to the statement on hearsay grounds. Then, on *cross-examination*, Parham's attorney got Grier to admit he did not have first-hand knowledge of this matter by asking him whether he had formed his opinion about who shot Mercer based on what he "hear[d] in the neighborhood." R.13-3 at 85. Grier's answer in the affirmative does not amount to hearsay. Parham's attorney did not elicit that statement to prove the truth of the matter asserted—that his client gave Kennedy a mission to kill Mercer. He used it to show that Grier had no personal knowledge of the matter and had formed his opinion based only on others' statements. Even if the evidence were hearsay, Kennedy's attorney reasonably preferred to allow the testimony into evidence rather than object to it, given that it undermined Kennedy's purported motive for the murder by showing that Grier "was [not] privy to any plan or plot to murder [Mercer] between . . . [Kennedy]

- 5 -

and . . . Parham." R.13-3 at 85. The Sixth Amendment does not require a lawyer to object to evidence that helps his client.

Kennedy next claims his counsel should have objected when the prosecutor read into evidence Dixon's police statement, which contained two embedded hearsay statements, one by Parham and one by Kennedy. As to the statement by Parham, there was no failure to object. Defense counsel objected when the prosecutor read the statement into evidence: "I have to object to that. This I think is hearsay . . . [H]e's going to make a statement about what somebody else says." R.13-4 at 105–06. The court overruled the point, and defense counsel persisted, arguing that a limiting instruction would not prevent the jury from considering the evidence against his client. *See id.* at 106–07 ("Q: Did Darnell say anything about Leo? [Defense Counsel]: This is my objection . . . That's why I think it's critical.").

Even so, Kennedy argues, counsel should have objected to the reading of Dixon's police statement earlier, namely when the prosecutor read Dixon's statement that Kennedy admitted to Mercer's murder. Because "Dixon . . . offered no affirmative testimony" at this point, Kennedy maintains, his attorney should have objected because Michigan law forbids the government from offering inculpatory evidence "under the guise of impeachment." *See People v. Stanaway*, 521 N.W.2d 557, 581 (Mich. 1994). It is unclear whether this "very narrow" exception applies or whether the "general rule" does, namely that the government may impeach its own witnesses and that evidence of a prior inconsistent statement may be admitted as impeachment even when the statement tends to inculpate the defendant. *People v. Kilbourn*, 563 N.W.2d 669, 671–72 (Mich. 1997). The

prosecutor sought to introduce the context of Dixon's police statement directly, and Dixon eventually offered some affirmative testimony in the case, though the evidence related most directly to Parham. Because counsel eventually objected, the evidence did not come in as substantive evidence of Kennedy's guilt, only as evidence to judge Dixon's credibility. Most importantly, any misstep did not prejudice Kennedy (or the state courts at least could reasonably think so), considering the other evidence against him, including his statement that he was at the shooting, the testimony of two eyewitnesses who saw Kennedy shoot Mercer and his confessions to other acquaintances.

That leaves one final ineffective-assistance claim—that counsel should have objected when the prosecutor read Jones' statement to the police that "everybody in the hood . . . kept saying everybody saw [Kennedy] shoot [Mercer]." R.13-5 at 195. Even if counsel should have objected to this statement, any mistake did not prejudice Kennedy. The trial court issued a limiting instruction immediately after the prosecutor read the statement, saying "nothing in [the] statement can be used to prove any of the facts that are stated therein. It can only be used for a limited purpose and that is judging the credibility of this witness." *Id* Kennedy offers nothing to rebut the presumption that the jury followed the instruction and did not consider the evidence in reaching its guilty verdict. *See United States v. Neuhausser*, 241 F.3d 460, 469 (6th Cir. 2001). Nor does Jones' statement—that unknown persons of unknown credibility said Kennedy shot Mercer—render the jury's verdict unreliable in light of Powell's and Grier's eyewitness testimony that they saw Kennedy shoot Mercer.

*Confrontation Clause*. Kennedy separately maintains he was denied the right "to be confronted with the witnesses against him," U.S. Const. amend. VI, when the prosecutor, in the course of reading Dixon's police statement out loud, read a statement by Parham. In the course of impeaching Dixon with his police statement, the prosecutor asked him whether his statement contained the following exchange with police officers:

Question: . . . Were you at the club the night of the shooting?

Answer: No, I was at home . . .

Question: But [Parham] wanted you to lie and say you were, so you could say he wasn't there?

Answer: Yes . . .

Question: Did [Parham] say anything about [Kennedy]?

Answer: He said he had told on [Kennedy] how he came back to his – [Parham]'s house after it happened and how [Kennedy] had said he, [Kennedy], had shot Tone.

R.13-4 at 107–08. Parham did not testify, and accordingly Kennedy did not have the opportunity to cross-examine him.

In debating the merits of this claim, the parties take sides on whether *Ohio v. Roberts*, 448 U.S. 56 (1980), or *Crawford v. Washington*, 541 U.S. 36 (2004), governs it. We need not resolve the point because the state court held that any error was harmless, App. at 13, and that analysis remains the same whether *Roberts* or *Crawford* governs the underlying claim.

Viewed through the deferential lens of AEDPA, the state court's harmlessness ruling must stand. Harmless-error review turns on an evaluation of the totality of the evidence before the jury and assessments about the relative weight of all of the evidence. These kinds of open-ended standards give States wide berth on habeas review. *Richter*, 131 S. Ct. at 786.

Several considerations support the reasonableness of the state courts' harmlessness conclusion. The trial court, for one, instructed the jury not to consider Dixon's statement as "proof of any of the facts . . . contained in the statement" but only "to judge the credibility of" Dixon. R.13-4 at 106. No doubt, limiting instructions do not eliminate all risks in this setting, *see Bruton v. United States*, 391 U.S. 123, 126 (1968), but they remove many of them. The State's case against Kennedy, for another, did not hinge on Parham's statement incriminating Kennedy. Parham's inculpatory reference to Kennedy lacked detail and was muddled to boot. Kennedy's own admissions placed him at the scene of the crime, and Powell's and Grier's testimony linked Kennedy to a drug-dealing operation that competed with Mercer's. Yeager testified that Kennedy admitted he shot Mercer, and two other eyewitnesses identified Kennedy as the shooter.

AEDPA is a steep hill to climb, *see Richter*, 131 S. Ct. at 788, and the state court had reason to credit the eyewitnesses' trial testimony. The eyewitnesses explained that any inconsistences in their testimony arose from concerns about their family's safety: Grier and his family had to be relocated before he would testify, and Dixon was attacked the week he gave his statement to the police. And the objectionable evidence—a statement by Parham passing the blame to Kennedy made as Parham asked Dixon to lie on his behalf at trial—was hardly the centerpiece of the case. On this record, a state court could reasonably reject any potential error in the admission of this evidence as harmless. *See id.*

No. 09-1781
*Kennedy v. Warren*

III.

For these reasons, we affirm.