J-S61007-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| RONALD MACNEAL, SR., | |
| Appellant | No. 3523 EDA 2017 |

Appeal from the Judgment of Sentence Entered September 26, 2017
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR-0001182-2016

BEFORE:  BENDER, P.J.E., BOWES, J., and PANELLA, J.

MEMORANDUM BY BENDER, P.J.E.:                  **FILED DECEMBER 20, 2018**

Appellant, Ronald MacNeal, Sr., appeals from the judgment of sentence of 5 to 10 years' imprisonment, followed by 5 years' probation, imposed after a jury convicted him of involuntary deviate sexual intercourse with a child (IDSI), 18 Pa.C.S. § 3123(b), aggravated indecent assault of a child, 18 Pa.C.S. § 3125(b), and corruption of minors, 18 Pa.C.S. § 6301.  Herein, Appellant challenges the admission of out-of-court statements by the child victim pursuant to 42 Pa.C.S. § 5985.1, commonly referred to as the Tender Years Hearsay Act (TYHA), as well as the sufficiency of the evidence to sustain his convictions.  After careful review, we affirm.

The trial court set forth a detailed summary of the evidence presented at Appellant's trial, as follows:

> [N.W.], the victim, was five years old at the time of the incident. She  testified  by  closed  circuit  television.    [N.W.]  stated  she

remembers going over [to Appellant's] house and he touched her. After making that statement, [N.W.] put her head down and did not respond verbally to any further questions. The defense had the opportunity[,] but chose not to cross[-]examine.

Megan Cronmiller is [N.W.]'s mother. On August 7, 2015[,] they were at [Appellant's] house for a barbecue. Ms. Cronmiller became tired and wanted to go home. [Appellant] asked if [N.W.] could stay over at his house that night. Ms. Cronmiller agreed because, at that time, she had a good relationship with [Appellant]. Ms. Cronmiller picked [N.W.] up the next morning at [Appellant's] house. Ms. Cronmiller thought it was unusual that [N.W.] was quiet and wanted to go home. As they were walking home, [N.W.] was unusually quiet and did[] [not] want to be touched. Ms. Cronmiller tried to hold [N.W.]'s hand to cross the street but she pulled away from her. When they got home, [N.W.] wet her pants, which was also unusual. Two hours later, [N.W.] wet her pants again. This abnormal behavior continued for a few more days. Ms. Cronmiller sensed there was something wrong and confronted [N.W.] about why she kept wetting her pants. [N.W.] put her head down and said [Appellant] touched her. Ms. Cronmiller then called 911 to report suspected child sexual abuse.

Sergeant James Cadden, is employed by the Borough of East Lansdowne Police Department with the rank of Sergeant and the position of Detective. He conducts criminal investigations that are beyond the scope of patrol division. On August 13[], 2015, around noon he received a radio call from the 911 center to respond to 810 Pembroke Avenue for a report of a child in distress. After interviewing Ms. Cronmiller, Sergeant Cadden interviewed [N.W.] alone. Initially[,] Sergeant Cadden had a conversation with [N.W.] to determine if she knew the difference between a truth and a lie, as well as reality versus make believe. Sergeant Cadden then asked [N.W.] what had happened. [N.W.] told Sergeant Cadden that she slept at [Appellant's] house and he touched her in her private parts and she pointed down below to her groin area. Sergeant Cadden attempted to get more detail. [N.W.] described watching a movie, eating popcorn and then said [Appellant] put a finger into her private parts, and again pointed to the groin area. [N.W.] then began to cry and Sergeant Cadden stopped the interview. Sergeant Cadden's next step was to secure [N.W.]'s wellbeing. He called for an ambulance and arranged for [N.W.] to be transported to Children's Hospital in Philadelphia. He also contacted the District Attorney's Criminal Investigation Division (CID) and Children and Youth Services of Delaware County (CYS).

He further arranged for a CYS representative to meet [N.W.] at the hospital. On August 14, [2015,] the day after receiving the complaint, Sergeant Cadden and Detective Bucci of the CID went to 401 Pembroke Avenue, [Appellant's] residence[,] to interview him. Present at the time of the visit were [Appellant] and the owner of the property, Mr. Thomas Antonelli. Detective Bucci interviewed [Appellant] while Sergeant Cadden interviewed Mr. Antonelli. Mr. Antonelli confirmed [N.W.] slept there on the night of the incident but was hesitant to answer further questions. Later, after [Appellant] had been removed from his residence, Mr. Antonelli contacted Sergeant Cadden and stated that he was afraid to say anything while [Appellant] was in his residence or near him. Mr. Antonelli told Sergeant Cadden he wanted to describe the night of the incident. He stated that early in the morning around 3:00 [or] 3:30 a.m. he was woken up by sounds of [N.W.] crying out in pain[,] or what Mr. Antonelli determined was pain. Mr. Antonelli stated he attempted to get to the top of the steps but could not due to the condition of his health. He lives on the ground floor and could not climb the steps.

Judy Kaplan is the Director and Lead Forensic Interviewer with the Family Support Line. She works for the Delaware County Children's Advocacy Center, which is a program of Family Support Line. The Delaware County Children's Advocacy Center is located at 100 West 6th Street in Media. Part of Ms. Kaplan's role as the Director of the Delaware County Children's Advocacy Center is to conduct forensic interviews of children when there are allegations of sexual abuse. The forensic interview is digitally recorded and a DVD is burned immediately after the forensic interview and given to law enforcement and CYS. Ms. Kaplan conducted a forensic interview with [N.W.] on August 14, 2015. The video recording of the interview was admitted into evidence and published to the jury in its entirety. In the recording, [N.W.] makes the following statements…. [N.W.] went to the doctor to get her private part checked because [Appellant] stuck his finger in her private part. [Appellant] went to sleep and when he woke up he got in bed with her and put his finger in her private part. When [Appellant] put his finger in her she felt like her private part was bleeding. [Appellant] also put his finger in her butt hole and it made [N.W.] feel like she was pooping. [Appellant] put his mouth on her private part. It felt like he was licking it. He also put his tongue in her "pee-pee." During this encounter[,] [Appellant] did not have his clothes on. [Appellant] put his "pee-pee" in her mouth and something came out in her mouth.

[Appellant] told [N.W.] if she told anyone what happened he would punch her in the face. [Appellant] fell asleep and [N.W.] kicked him repeatedly in his private part "[s]o he'd be dead."

Detective Mark Bucci has been employed by the Delaware County Criminal Investigation Division. He has investigated child abuse and child sexual exploitation for 24 to 27 years. He took a recorded statement from [Appellant] on August 14, 2015. The statement was admitted into evidence and published to the jury. During the statement, [Appellant] denied the allegations but stated he was playing "poke the butt" with [N.W.] and her brother. He described poke the butt as a game where he would jokingly poke them on their butts with his finger and the children would laugh. [Appellant] admitted that one time [N.W.] was wiggling her butt as they played the game and he accidently touched her vagina. [Appellant] stated that at one point during the sleep over [N.W.] was in bed with him. [Appellant] also stated [N.W.] stayed over his house four times and each time he would give her a bubble bath and dry her off without touching her.

Mr. Thomas Antonelli is the owner of the property where [Appellant] resided at the time of the incident. He was the final Commonwealth witness. Mr. Antonelli takes medication to sleep but it does[ not] always work. A lot of times[,] Mr. Antonelli has trouble sleeping and spends the night laying [*sic*] in bed half asleep. On the night of the incident, between 10 p.m. and midnight, Mr. Antonelli heard what he described as an "ungodly cry out." Due to his physical condition[,] Mr. Antonelli sleeps in his living room on the couch. Upon hearing the cry out[,] Mr. Antonelli attempted to go up the steps and screamed something because he wanted to know what happened. [Appellant] answered that he would be down in a little bit. About five to fifteen minutes later[,] [Appellant] and [N.W.] came downstairs. [Appellant] stated [N.W.] had an upset stomach and he was going to make her popcorn. Mr. Antonelli was concerned because [N.W.] was afraid to look at him. He testified [N.W.] had never been afraid to look at him. Also, Mr. Antonelli noticed a change in [N.W.'s] emotional state. She was usually very happy. She was not happy when she came downstairs. Mr. Antonelli stated[,] "From the time that they went in the kitchen to make the popcorn to the time when they went back upstairs, it was just sustained silence. It was like this eerie silence, like something had happened but it wasn't being said out loud." Mr. Antonelli recalled that at some point[,] [N.W.] started to say something and [Appellant] put his finger to his mouth gesturing for [N.W.] to be quiet. Mr.

Antonelli further testified [that,] in the beginning[,] [N.W.'s] mother and brother would stay over. Then it did[] [not] take long to become just the children and then just [Appellant] and the little girl.

[Appellant] did not testify. Instead[,] he presented an expert witness who was qualified as an expert in pediatric medicine. Dr. Jeffrey Bomze opined that[,] within a reasonable degree of medical certainty[,] the history he reviewed did not support the medical findings contained in the … [h]ospital records. He based that opinion on the size of [Appellant's] fingers, the small area of a five year old['s] vagina and the report of [Appellant's] moving the finger in the vagina without a lubricant. Dr. Bomze testified that based on that history there should be bleeding and evidence of trauma to the vagina. He also testified he thought it was significant there was no blood in the urine. Dr. Bomze stated the lack of these findings supported his conclusion.

Trial Court Opinion (TCO), 2/8/18, at 1-8 (citations to the record and footnotes omitted).

Based on this evidence, the jury convicted Appellant of the offenses stated *supra*. On September 26, 2017, the court sentenced Appellant to 5 to 10 years' imprisonment, followed by 5 years' probation. He filed a timely notice of appeal, and he also timely complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Herein, Appellant presents two issues for our review:

I. Whether the [t]rial [c]ourt erred in granting the Commonwealth's request and permitting hearsay testimony pursuant to the [TYHA], 42 [Pa.C.S. §] 5985.1[?]

II. Whether the evidence submitted by the Commonwealth was insufficient as a matter of law to prove the charges of [IDSI], [a]ggravated [i]ndecent [a]ssault and [c]orrupting the [m]orals of [a minor?]

Appellant's Brief at 6.

Appellant first contends that the trial court erred by admitting, pursuant to the TYHA, out-of-court statements that N.W. made to her mother and Sergeant Cadden, as well as the forensic interview of N.W. that was conducted by Ms. Kaplan. According to Appellant, N.W. was unavailable for cross-examination at trial, and her out-of-court statements were testimonial in nature, thereby making their admission at trial a violation of his constitutional right to confront witnesses against him.

This Court has explained that,

[u]nder the TYHA, certain out-of-court statements made by a child victim or witness may be admissible at trial if the child either testifies at the proceeding or is unavailable as a witness, and the court finds "that the evidence is relevant and that the time, content and circumstances of the statement provide sufficient indicia of reliability." 42 Pa.C.S.[] § 5985.1(a)(1). However, as discussed *infra,* with regard to testimonial hearsay, United States Supreme Court case law has rejected the indicia of reliability standard as violative of the Sixth Amendment to the United States Constitution.

The Sixth Amendment to the United States Constitution, otherwise known as the Confrontation Clause, guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. Previously, in ***Ohio v. Roberts***, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the United States Supreme Court held that the Confrontation Clause did not bar admission of an unavailable witness's statement against a criminal defendant, provided the statement was surrounded by "adequate indicia of reliability." ***Id.*** at 66, 100 S.Ct. 2531. According to the ***Roberts*** Court, such indicia exists when the testimony being considered either fits within a "firmly rooted hearsay exception," or contains "particularized guarantees of trustworthiness." ***Id.***

Subsequently, in ***Crawford v. Washington***, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court overruled ***Roberts*** in part. Specifically, the

Supreme Court rejected the "indicia of reliability standard" where a witness is deemed unavailable. Instead, the Supreme Court held that the admissibility of out-of-court statements by an unavailable witness turns upon a determination of whether the statements are testimonial or nontestimonial in nature:

> Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. **Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.**

*Id.* at 68, 124 S.Ct. 1354 (emphasis added).

*In re N.C.*, 74 A.3d 271, 274–75 (Pa. Super. 2013), *aff'd*, 105 A.3d 1199 (Pa. 2014).

We begin by addressing Appellant's argument that N.W. was unavailable for cross-examination at trial. Appellant acknowledges that N.W. was called to the stand by the Commonwealth; however, he contends that, during the direct examination, N.W.

> was unresponsive to the prosecutor's questions, and the only response that was at all relevant was that she testified that "he touched me[."] (N.T. [Trial,] 5/31/17[, at] 57)[.] She provided no other details and answered no further questions, and the Commonwealth stopped [the] direct[-]examination. ([*Id.* at] 57-59). Based upon her refusal to respond further to the Commonwealth's attorney, defense counsel did not cross[-]examine N.W.

> Thereafter, counsel engaged in an argument as to whether or not [N.W.] "testified" for purposes of the TYHA. There was no finding of unavailability by the [c]ourt[,] nor was there any attempt by the Commonwealth to establish unavailability under the Act. The [c]ourt appears to have concluded that N.W. did testify, and then permitted the Commonwealth to introduce the video[-]taped interview of N.W., her mother's testimony that included [N.W.'s]

- 7 -

hearsay statements, and additional hearsay statements introduced by [Sergeant] Cadden.  ([***Id.*** at] 100-15, 149-64).

Appellant's Brief at 9-10.

According to Appellant, the facts of this case mirror those in ***In re N.C.***, where this Court deemed the child witness unavailable for cross-examination, and our Supreme Court affirmed that decision on appeal.  After careful review of both this Court's opinion in ***In re N.C.***, and our Supreme Court's decision affirming, we disagree with Appellant's argument.  As this Court explained ***In re N.C.***, the victim, A.D.,

> was four years old at the time of the adjudicatory hearing.  In the portion of the hearing on A.D.'s competence to testify, the record reflects that defense counsel was able to elicit non-verbal and infrequent verbal responses from A.D.  During direct[-]examination on the facts at issue, however, A.D. was unable to provide testimony regarding the incident. When asked whether she liked N.C., A.D. shook her head.  When asked whether she had ever been at the same house as N.C., A.D. again shook her head.  When asked to identify N.C., A.D. gave no response.  After a break, A.D. shook her head in the negative when asked whether (a) she had ever played games with N.C.; (b) whether N.C. had ever touched her; and (c) whether she wanted to talk about the incident.  In fact, A.D. either shook her head in denial or gave no response when repeatedly asked whether N.C. had ever touched her.
>
> Eventually, N.C.'s counsel objected to the continued questioning of A.D.:
>
>> Just for the record, ... I would like to note our objection to continuing the questioning in the face of the child's obvious assertions that she doesn't want to participate. She wants to go home. She's not responsive to [the prosecutor's] questioning to any degree that's being helpful to the relevant facts of this particular case. It is our position that to continue to cajole her or otherwise to force her into answering questions is rapidly approaching a coercive situation with this young child. And unless there's some

particular reason why we should continue this, we would simply have to object to any continued type of coercion into forcing her into answering questions.

The juvenile court overruled the objection.

Upon returning to the stand, when the prosecutor again attempted to elicit testimony from A.D. regarding the incident, the child became nonresponsive, curling up into a fetal position. At that point, in time, the following discussion transpired:

[The prosecutor]: Your Honor, let the record reflect that [A.D.] is curling up in a fetal position into a ball[.]

THE COURT: The record will reflect that.

Q. [The prosecutor]: Honey, is [N.C.] nice?

A. [A.D.]: (No response).

[The prosecutor]: She's further curling up in a ball.

THE COURT: The record will reflect that.

[The prosecutor]: Your Honor, I don't know if the Court wants to inquire at all. **I don't think I'm going to get anywhere.**

THE COURT: [To the child] ... [C]an you look at me? ... [A.D.] is not acknowledging me so, ... [to defense counsel] why don't you go ahead and take her.

... [D]o you have any questions?

[Defense counsel]: No.

THE COURT: Okay. Just wanted to get that clear before I entertain—okay. Go ahead. I think I will, for the record, I mean, my position in calling her was to see if she would testify so we don't have to inquiry [*sic*] what went on in the break, **but she's not going to testify.**

Thus, A.D. refused to testify about the incident *on direct examination* and eventually was unable to provide *any* response to the prosecutor's questions. Based upon the record before us, we conclude that the juvenile court improperly deemed A.D. "available" for purposes of the Sixth Amendment. The record

> simply does not support a determination that A.D. was available for cross-examination by defense counsel.

*In re N.C.*, 74 A.3d at 275-76 (emphasis in original; internal citations to the record omitted).

In affirming our decision in *In re N.C.*, our Supreme Court added further details about A.D.'s conduct on the stand, and the futile efforts made to elicit her testimony. For instance, the trial court twice recessed to give A.D. a break, and it also allowed her to sit in her father's lap, and with her maternal grandmother, while being questioned by the prosecutor. *In re N.C.*, 105 A.3d at 1203-05. Nevertheless, A.D. still refused to respond to the prosecutor's questions. While A.D. nodded "yes" when asked if she knew N.C. and if he was present in the courtroom, she thereafter either shook her head, or did not respond at all, to at least 20 questions about N.C. and the alleged abuse. *Id.* at 1203-04. Nevertheless, the questioning continued, at which point A.D. refused to look at the prosecutor or answer any questions, and stated that she wanted to go home. *Id.* at 1204-05. After taking a second break, during which defense counsel lodged the above-quoted objection, A.D. was again questioned and remained wholly unresponsive, ultimately curling into the fetal position.

In comparison, here, during the direct-examination of N.W., she testified that she was six years old, and she answered general questions about her school, her hobbies and interests, and her pets. N.T. Trial, 5/31/17, at

49-52. The prosecutor then asked N.W. if she knew Appellant,[1] and N.W. nodded her head. *Id.* at 52. When the prosecutor reminded N.W. to answer in words, and again asked her if she knew Appellant, N.W. replied, "Yes." *Id.* The prosecutor next asked N.W. if she ever went to Appellant's house, to which N.W. again said, "Yes." *Id.* at 57. N.W. also said "yes" when asked if "anything happen[ed]" when she was at Appellant's home. *Id.* When the prosecutor asked N.W. what had happened, she replied, "He touched me." *Id.*

Defense counsel then objected to the next question asked of N.W., and a lengthy sidebar discussion ensued. *Id.* at 57-60. When the prosecutor resumed the direct-examination of N.W., the following exchange occurred:

> [The Prosecutor]: [N.W.], can you tell us -- can you -- first of all, can you move your arms, please? We want to see your face. No? Can you stick your head up a little bit so we can see your face more? Can you tell us, please, [N.W.], just be -- just -- then it will be over. Where did [Appellant] touch you? That's okay, [N.W.] [N.W.], thank you. I don't have any more questions, okay?
>
> THE COURT: All right. Thank you. Cross-examine.
>
> [The Commonwealth]: Thank you, Your Honor.
>
> THE COURT: Thank you.
>
> [Defense Counsel]: I have no questions, Your Honor.
>
> THE COURT: All right. Okay. Thank you very much. Call your next witness.

*Id.* at 60-61.

---

[1] The Commonwealth asked if N.W. knew a man named "Ronnie Rizzle," which Appellant acknowledged was his nickname. *See* N.T. Trial, 5/31/17, at 267.

Clearly, ***In re N.C.*** is distinguishable from this case. There, the victim refused to verbally respond to at least twenty questions asked by the prosecutor about N.C. and the alleged abuse. Efforts were made to encourage A.D.'s testimony, including the court's taking several breaks and permitting A.D. to sit with her father and grandmother. Nevertheless, A.D. refused to testify, stated she wanted to go home, would not look at the prosecutor, and eventually curled into the fetal position. Defense counsel objected to the questioning at one point, and made a rational decision not to cross-examine A.D. after observing the lengthy and unsuccessful efforts by the prosecutor and the court to elicit her testimony.

To the contrary, here, N.W. verbally answered several questions specifically about Appellant and his abuse, including stating that Appellant had touched her. When N.W. hid her face and refused to answer the prosecutor's question about where Appellant had touched her, the prosecutor immediately concluded his direct-examination. Defense counsel then had the opportunity to cross-examine N.W., but he chose not to ask her a single question. In light of this record, N.W. was not unavailable, as was A.D., and Appellant was clearly given the opportunity to cross-examine her. Thus, his argument that his Confrontation Clause rights were violated by the admission of N.W.'s out-of-court statements under the TYHA is meritless.

Appellant next challenges the sufficiency of the evidence to sustain his convictions. In support of this issue, Appellant solely contends that N.W.'s out-of-court statements were inadmissible, and "[t]he Commonwealth

produced no other competent evidence … to establish the elements of the crimes of [IDSI], [a]ggravated [i]ndecent [a]ssault or [c]orrupting the [m]orals of [m]inors beyond a reasonable doubt." Appellant's Brief at 12. Because, for the reasons stated *supra*, we reject his argument that N.W.'s hearsay statements were improperly admitted at trial, his sufficiency-of-the-evidence claim fails, as well.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/20/18