**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JASON DALE NEWCOMB | : | |
| | : | |
| Appellant | : | No. 798 MDA 2022 |

Appeal from the Judgment of Sentence Entered April 1, 2022
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0001871-2020

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JASON DALE NEWCOMB | : | |
| | : | |
| Appellant | : | No. 799 MDA 2022 |

Appeal from the Judgment of Sentence Entered April 1, 2022
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0001451-2020

BEFORE:   KUNSELMAN, J., McCAFFERY, J., and COLINS, J.[*]

MEMORANDUM BY McCAFFERY, J.:                    **FILED: DECEMBER 21, 2023**

Jason Dale Newcomb (Appellant) appeals from his jury trial convictions for a series of rapes and other sexual crimes committed against his biological daughter, J.N.  Appellant contends (1) that the trial court erred in allowing two witnesses to testify to statements made by J.N. implicating Appellant; (2)

---

[*] Retired Senior Judge assigned to the Superior Court.

that the trial court erred in denying his request for production of privileged material by J.N.'s psychotherapist; and (3) that the trial court illegally imposed "no contact" provisions as part of his sentence. The Commonwealth concedes the third issue. We agree and strike that aspect of Appellant's sentence. In all other respects, we affirm.

The victim, J.N., is the biological daughter of Appellant and turned 18 the weekend before trial. She informed the jury that Appellant began fondling her vagina and inserting his fingers when she was 7, usually when the two were on the couch watching television. Around age 8 or 9, Appellant told J.N. to come to the living room and forced her to watch pornography, telling J.N. that "because the woman in the video was liking it that I should." N.T., 11/16/23, at 186. J.N. stated that when she was about 9 years old, Appellant forced her to engage in oral and vaginal sex. Appellant would fondle her "at least once a week," but "[h]e couldn't really get me alone to rape me unless my mom was at work or she was just gone in general." *Id.* at 192. When J.N. started fifth grade, her mother started working more hours and Appellant raped her two to three times a week. J.N. also testified that Appellant forced her to undress and took nude photographs. The abuse ended in 2016 when Appellant and J.N.'s mother separated.

J.N. began experiencing anxiety and depression, and her schoolwork suffered. A school employee referred her to Olivia Houston, a prevention specialist employed by J.N.'s school. Houston noticed that J.N. exhibited poor hygiene, showed signs of depression, and was uncomfortable around males.

Houston arranged a meeting with the Child Guidance Resource Center. J.N.'s mother escorted J.N. to the appointment. During the intake process, an employee asked J.N. if she had been sexually abused. J.N. said yes, which marked the first time she had disclosed the abuse. J.N.'s mother, who had accompanied her to the appointment, was not in the room during the intake process.

J.N.'s disclosure triggered mandatory reporting obligations to ChildLine, the Commonwealth's Department of Human Services program for child abuse investigations. The matter ultimately made its way to Detective Aaron Harnish, employed by the Lancaster City Bureau of Police, who arranged a forensic interview at Children's Alliance on March 8, 2018, between J.N. and James Pennebaker.[1] Detective Harnish observed the interview and characterized J.N. as being "extremely uncomfortable talking about what [Appellant] did to her." N.T., 11/18/21, at 476. He, J.N., and J.N.'s mother decided that further therapy would be appropriate.

J.N. then sat for a second forensic interview with Karen Melton on April 19, 2018. Melton testified that she did not watch the Pennebaker interview prior to her interview with J.N., explaining that "we don't want to do what's called duplicative interviews." N.T., 11/17/21, at 372. Melton used an anatomical diagram for J.N. to point to due to her continuing difficulty with

_____

[1] Pennebaker was no longer employed by Children's Alliance by the time of trial and did not testify. Another witness identified the date of this interview as March 13, 2018.

saying certain words. During Melton's testimony, the interview with Pennebaker was played to the jury. Melton agreed that J.N. was "having difficulty vocalizing what was happening to her" and that Pennebaker had J.N. write things on paper. A copy of a paper was read to the jury through Melton; J.N. wrote that she "was about 7 and I didn't understand what was going on but he threatened me and said he'd hurt me if I told anybody." *Id.* at 367. J.N. also wrote, "He would touch me inappropriately when my mom wasn't around." *Id.* at 368. She further wrote that Appellant "started raping me when I was about [ten or 11 years old]." *Id.*

Following these interviews, the investigators decided that J.N. "still wasn't as comfortable as what would be required to go into court" in terms of discussing Appellant's abuse and decided in August of 2018 to designate the case inactive pending further therapy. N.T., 11/18/21, at 480.

J.N. began treatment with Jessica Ventura, a psychotherapist, in August of 2019, who had nine sessions with J.N., occurring approximately once a week through January 10, 2020. During those sessions, J.N. "had significant difficulty verbalizing her experiences of abuse." N.T., 11/18/21, at 388. Ventura had J.N. write down her experiences and then would discuss whatever J.N. wrote, "depend[ing] on how she was feeling." *Id.* at 389. Ventura identified multiple "trigger words . . . that she was incapable of saying or writing[.]" *Id.* at 392. Those "trigger words were breast, penis, vagina, rape, oral, and intercourse." *Id.* Ventura discussed substitution words, which were "boobs, titties, dick, pee pee, thingy, cooch, coochie, force, tears, vomit,

disgust, gross, texture, bad, inappropriate, danger, discomfort, and doing it."
*Id.* Ventura testified to various specific incidents of abuse that J.N. wrote down and discussed during these sessions.

On January 2, 2020, Appellant was charged with 13 counts, later reduced to 11 in the criminal information filed at docket CP-36-CR-0001451-2020.[2] Later, Appellant was charged with four crimes following the execution of a search warrant on a laptop owned by Appellant. A digital search revealed 278 images of child pornography and internet searches for, among other terms, "father/daughter incest." *Id.* at 435. 48 of these photographs showed J.N. in the shower. Appellant was then charged at docket CP-36-CR-0001871-2020 with four crimes.[3] Both dockets were tried together, and Appellant was found guilty of all charges. Appellant was sentenced on April 1, 2022, to an aggregate term of 30 to 80 years' incarceration and he timely appealed to this Court.[4]

_____

[2] Appellant was charged with two counts each of rape of a child, 18 Pa.C.S. § 3121(c); aggravated indecent assault, 18 Pa.C.S. § 3125(b); indecent assault of a child under 13 years of age, 18 Pa.C.S § 3126(a)(7); and corruption of minors, 18 Pa.C.S. § 6301(a)(1), (i). He was convicted of one count of each of the following: incest, 18 Pa.C.S. § 4302; involuntary deviate sexual intercourse, 18 Pa.C.S. § 3123(b); and dissemination of sexual material involving a child, 18 Pa.C.S. § 5903(c)(1).

[3] At this docket, Appellant was charged with two counts each of manufacturing child pornography, 18 Pa.C.S. § 6312(b), and possession of child pornography, 18 Pa.C.S. § 6312(d)(1).

[4] On August 11, 2022, Appellant filed a motion to consolidate the appeals, which we granted on August 16, 2022.

Appellant complied with the trial court's order to file a concise statement of matters complained of on appeal, and the court authored an opinion addressing Appellant's claims. Appellant raises the following issues on appeal.

> I. Did the trial court err in ruling that the testimony of Jessica Ventura was admissible pursuant to 42 Pa.C.S. § 5985.1, where her testimony did not satisfy the requirements of Section 5985.1, and did the court further err in ruling that defense counsel was not entitled to receive records regarding Ms. Ventura's treatment of J.N.?

> II. Did the trial court err in ruling that the testimony of Karen Melton, and the videotape of Ms. Melton's April 19, 2018[,] interview with J.N. was admissible pursuant to 42 Pa.C.S. § 5985.1, where her testimony did not satisfy the requirements of Section 5985.1?

> III. Did the trial court err in imposing a condition of no contact with the victim or the victim's family, where the court had no jurisdiction to impose this condition, as the Pennsylvania Department of Corrections has exclusive authority over state prison conditions, and the Pennsylvania Department of Probation and Parole has exclusive authority over state parole conditions?

Appellant's Brief at 8-9.

Appellant's first and second issues both challenge the admissibility of hearsay evidence introduced pursuant to the Tender Years Hearsay Act (TYHA). *See* 42 Pa.C.S. § 5985.1. The two arguments in support are largely identical, and the trial court addressed them together. However, Appellant's first issue includes a subclaim regarding the disclosure of J.N.'s mental health records. We address the TYHA issues together for ease of discussion, and separately address Appellant's claim that he was entitled to J.N.'s mental health records.

The TYHA sets forth the following requirements.

- 6 -

(a) General rule.--

(1) An out-of-court statement made by a child victim or witness, who at the time the statement was made was 16 years of age or younger, describing any of the offenses enumerated in paragraph (2), not otherwise admissible by statute or rule of evidence, is admissible in evidence in any criminal or civil proceeding if:

(i) the court finds, in an in camera hearing, that the evidence is relevant and that the time, content and circumstances of the statement provide sufficient indicia of reliability; and

(ii) the child either:

(A) testifies at the proceeding; or

(B) is unavailable as a witness.

42 Pa.C.S. § 5985.1.

The trial court held a pre-trial hearing on the admissibility of these statements. Ventura testified that J.N. was referred to her and knew that the referral involved sexual abuse by Appellant. However, Ventura did not know any specific facts prior to meeting J.N. She explained that she does not have any set interview technique, as her approach "is different for each client based on their needs. For [J.N.] specifically[, Ventura] used a person-centered approach with the focus on the connection between emotions, thoughts, and feelings." N.T., 11/15/21, at 68-69. To process J.N.'s trauma she "used narrative exposure therapy. Through this we used writing where she would start with using her earliest memories of trauma and working up from there and documenting them." *Id.* at 69. Ventura chose to use writing because "[J.N.] had a very difficult time self-reporting through her own words what

had happened. She struggled to say specific sexual acts, [and] sexual parts of the body that were involved in these traumas[.]" *Id.*

Ventura did not tell J.N. what to write, and she did not lead J.N. in any way. What J.N. chose to write "came strictly from her." *Id.* at 71. J.N. disclosed five specific memories. Her first memory dated to age 6 or 7, when Appellant told her to take off her pants and groped her thighs. At age 7, Appellant "sat her down and forced her to view a video of two people doing anal and oral sex." *Id.* J.N. also told Ventura that Appellant forcibly penetrated her when she was in fourth grade, and she recalled in fifth grade that Appellant, while driving with J.N., pulled into an isolated area, forced her to undress, and took pictures of her. Finally, when she was 12 years old, J.N. recalled that Appellant forced her to undress and pinned her against Appellant's bed. As he tried to rape her, J.N. fought back, kicking Appellant and telling him to leave her alone.

Turning to the admissibility of statements to Karen Melton, the Commonwealth called Mary Halye, the manager of Children's Alliance, as Melton was sick and unavailable to testify at the pre-trial hearing. Halye explained the general process that the facility used, which "follow[s] the National Children's Advocacy Center Protocol." N.T., 11/16/21, at 101. Interviewers do not use suggestive or leading questions, as the goal is for the child "to provide a free narrative in their own words, in their own way." *Id.* at 101-02. The interviewers "typically know minimal information about the child and the reason they are coming," and they are generally not aware of

the specific allegations. *Id.* at 103. The Commonwealth played the forensic interview between Pennebaker and J.N., with Halye characterizing J.N. as having a difficult time verbalizing what had happened. J.N. wrote during this interview that "my dad sexually abused me. I was about [seven years old] and I didn't understand what was going on[.]" *Id.* at 110. The Commonwealth then played the interview between Melton and J.N.

The trial court determined that the statements to Ventura and Melton were admissible under the TYHA.[5] On appeal, Appellant primarily challenges the spontaneity of J.N.'s disclosures. Citing a dictionary definition of "spontaneous" to mean "coming or resulting from a natural impulse or tendency; without effort or premeditation; natural and unconstrained; unplanned," Appellant argues that her statements were not spontaneous as "[a] primary purpose of J.N.'s therapy with Ms. Ventura was so that she could talk about the sexual abuse[.]" Appellant's Brief at 28. Similarly, J.N. knew the purpose of her interview with Melton. Appellant additionally suggests that J.N. had a motive to fabricate the allegations, "as she was clearly angry with her father for abandoning the family," and "her terminology was not unexpected . . . as she was 15 or 16 years old" when she gave the statements. *Id.*

---

[5] Appellant did not object to the admission of Pennebaker's interview.

Beginning with spontaneity, Appellant's implicit argument appears to be that the forensic interview setting precludes spontaneous disclosures because the interviewers anticipate that the child may disclose incidents of abuse.

"We will not reverse the trial court's decision to admit evidence pursuant to the tender years statute absent an abuse of discretion." *Commonwealth v. Curley*, 910 A.2d 692, 697 (Pa. Super. 2006). Section 5985.1(a)(1)(i) of the TYHA sets forth two conditions: the statement must be (1) relevant and (2) bear sufficient indicia of reliability with respect to the "time, content and circumstances" of the statement. There is no dispute that the evidence is relevant. Thus, the focus is on the indicia of reliability.

Our Supreme Court has followed United States Supreme Court caselaw on this issue. In *Idaho v. Wright*, 497 U.S. 805 (1990), the High Court addressed whether a defendant's confrontation rights were violated when the trial court admitted hearsay statements made by a child, who did not testify at trial, to a pediatrician who conducted a sexual examination. *Wright* applied a slightly modified version of the framework developed in *Ohio v. Roberts*, 448 U.S. 56 (1980) (abrogated by *Crawford v. Washington*, 541 U.S. 36 (2004)),[6] to ascertain whether a child's disclosure was trustworthy. The Court held that "the 'particularized guarantees of trustworthiness' required for admission under the Confrontation Clause must likewise be drawn from the

---

[6] *Wright* and *Crawford* address witnesses who were not subject to cross-examination at trial, whereas J.N. testified. Appellant's argument is limited to the TYHA.

- 10 -

totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief." *Id*. at 820.

In *Commonwealth v. Delbridge*, 855 A.2d 27 (Pa. 2003), our Supreme Court, citing *Wright*, stated that for admissibility under the TYHA, "the most obvious factors to be considered include the spontaneity of the statements, consistency in repetition, the mental state of the declarant, use of terms unexpected in children of that age and the lack of a motive to fabricate." *Id.* at 47. In *Commonwealth v. Walter*, 93 A.3d 442 (Pa. 2014), our Supreme Court stated that the reliability assessment does not include whether there is a "lack of physical evidence or possible alternative explanations for the victim's physical complaints," as those "are irrelevant to a determination of whether the time, content, and circumstances of the victim's statements . . . provided sufficient indicia of reliability so as to be admissible under the TYHA." *Id.* at 456. "The focus is on the truthfulness of the statements," which is assessed by reference to the factors discussed in *Wright*. *Id.* at 453.

Appellant argues for a meaning of "spontaneity" that is more akin to the excited utterance hearsay exception. *Commonwealth v. Upshur*, 764 A.2d 69, 75 (Pa. Super. 2000) (defining an excited utterance as a "spontaneous declaration . . . made so near the occurrence both in time and place as to exclude the likelihood of its being emanated in whole or in part from his reflective faculties.") (citations omitted). Appellant asserts that J.N. had time to engage her "reflective faculties" due to the time between her initial

- 11 -

disclosures and her interviews with Ventura and Melton, and her knowledge that the interviewers wished to talk about her allegations. For purposes of the TYHA, spontaneity is typically discussed in the sense of not being asked a suggestive or leading question, as demonstrated by ***Commonwealth v. Strafford***, 194 A.3d 168 (Pa. Super. 2018). In that case, we adopted the trial court's opinion addressing the admissibility of statements under the TYHA. The appellant argued that the statements made to a forensic interviewer in his case, who was trained through the same National Children's Advocacy Center model used by Melton, were unreliable. The trial court cited the open-ended interview process, and that the victim spontaneously began talking about the appellant during the interview. The trial court determined that the statements were spontaneous because the interviewer used a nonsuggestive technique, and the interview was conducted in a neutral manner based on her training. We conclude that the same logic applies here. ***See also Commonwealth v. Moore***, 755 EDA 2020 (unpub. memo.) (Pa. Super. June 30, 2021) (concluding that statements made to forensic interviewer were spontaneous); ***Commonwealth v. Kaminsky***, 631 EDA 2019 (unpub. memo. at 6) (Pa. Super. April 13, 2020) (concluding that statement given to forensic interviewer qualified as spontaneous; "The child victim's initial statements arose spontaneously in play, and were most comprehensively explored in a forensic interview with a trained interviewer who knows how to facilitate spontaneous statements from young witnesses

and victims without using leading questions or introducing concepts outside of the child's ken.").[7]

We also note that other jurisdictions discussing the **Wright** factors in response to similar arguments have found statements to forensic interviewers to be spontaneous provided that the questions are not leading. **Taylor v. State**, 841 N.E.2d 631, 637 (Ind. Ct. App. 2006) (concluding that statement to forensic interviewer were admissible as the interviewer "did not ask [the victim] leading questions"); **Bishop v. State**, 982 So. 2d 371, 375 (Miss. 2008) (concluding that victim's statements to therapist were admissible as "the trial court found 'nothing to indicate that the child's statements were suggested or solicited by [the therapist], that many of them were spontaneous narratives and that they were obtained for medical and psychological treatment."). Indeed, the **Wright** Court indicated that procedural safeguards, such as recording the interview and avoiding leading questions, may enhance the reliability of statements. **Wright**, 497 U.S. at 818 (stating that "the procedural guidelines propounded by the court below may well enhance reliability of out-of-court statements of children regarding sexual abuse").

Additionally, Appellant's focus on the alleged lack of spontaneity overlooks that, "[p]ursuant to the Tender Years Hearsay Act, a trial court must consider the totality of the circumstances when determining whether a child's

---

[7] We may rely on unpublished decisions filed after May 1, 2019, for their persuasive value. **See** Pa.R.A.P. 126(b).

out-of-court statement is trustworthy." *Interest of D.C.*, 263 A.3d 326, 335 (Pa. Super. 2021) (citation omitted). Thus, spontaneity is simply one factor. *Fidler v. Cunningham-Small*, 871 A.2d 231, 235 (Pa. Super. 2005) ("There are several factors a court may consider in determining reliability . . . including, but not limited to, the spontaneity and consistent repetition of the statement(s); the mental state of the declarant; the use of terminology unexpected of a child of similar age; and the lack of a motive to fabricate.") (quotation marks and citation omitted; bracketing in original). "[T]he unifying principle is that these factors relate to whether the child declarant was particularly likely to be telling the truth when the statement was made." *Wright*, 497 U.S. at 822.

In light of the foregoing, we find no abuse of discretion in the trial court's determination that the statements were spontaneous. J.N.'s initial disclosure was spontaneous as she indicated to the employee processing her intake form that she had been sexually abused. J.N.'s mother took her to that appointment but was not in the room for that disclosure. The subsequent statements to Ventura and Melton were spontaneous as both interviewers testified that the questions were open ended and not suggestive. *See* Trial Court Opinion, 8/17/22, at 7 ("The statements to each of the individuals were spontaneous as the minor victim led the discussions and the minor victim was not led or directed by any of the witnesses.").

Moving beyond spontaneity, Appellant argues that the statements to Ventura revealed specific instances of abuse that differed from those disclosed

to others. Appellant also avers that some of the statements in the Melton interview are inconsistent with the Pennebaker interview; specifically, that in one interview "J.N. stated she never saw the photos [Appellant] took of her, but in the other interview she stated he did show her the photos." Appellant's Brief at 34.

With respect to the Melton and Pennebaker interviews, we note that those interviews were played to the court but not transcribed. Beyond the minor discrepancy above, Appellant does not suggest that the statements were so markedly different as to be truly inconsistent. As to the Ventura statements, Appellant does not specifically address what portions were inconsistent, instead relying on a vague claim that the statements differed from other statements. In any event, the court credited that some discrepancies existed, as its opinion noted "J.N.'s distress in discussing the abuse" in connection with its conclusion that the statements demonstrated "consistency . . . to the degree that there was no indication of a motive to lie." Trial Ct. Op., 8/17/22, at 7 n.22. The trial court therefore found that any discrepancies were immaterial when measured against the overall consistency of her allegations. We discern no abuse of discretion in that judgment.

Finally, while we agree that J.N. used several terms appropriate for her age, Ventura testified that J.N. had difficulty using certain terms and Ventura prepared a list of substitute words. Again, the Melton and Pennebaker interviews were not transcribed, but the trial court states, "J.N.'s difficulty verbalizing observed in the video recorded interviews was consistent with the

difficulty Ms. Ventura testified to . . . bolstering the court's conclusions that the statements were genuine[.]" *Id.*

Overall, the minor issues identified by Appellant do not discredit the trial court's assessment that J.N.'s statements to Ventura and Melton were sufficiently trustworthy and that J.N. was likely to be telling the truth. We therefore find that the trial court properly admitted J.N.'s statements to Ventura and the introduction of the Melton video.

We now turn to the additional subclaim in Appellant's first issue, that the trial court erred by failing to compel Ventura to turn over her complete file concerning J.N.'s sessions.

During argument on the admissibility of Ventura's statements, Appellant stated his belief that he "would be entitled to [the] full contents of Ms. Ventura's file regarding all of the conversations that she's had with [J.N.]." *Id.* at 87. Recognizing that the material was privileged, Appellant argued that the Commonwealth broke the privilege by calling Ventura to testify. The trial court disagreed, stating that the privilege was for J.N. to assert or waive. Appellant countered that privilege "can't be broken selectively." *Id.* at 88. On appeal, Appellant faults the trial court failing to cite precedent in its ruling, stating: "The court held that J.N. could selectively waive the psychologist-patient privilege . . . but it cited no law supporting its finding that a partial waiver was permitted." Appellant's Brief at 29. Appellant argues that *Commonwealth v. T.J.W.*, 114 A.3d 1098 (Pa. Super. 2015), is favorable to his position as the Court there held that privilege concerning mental health

- 16 -

records can be waived when the individual places confidential information at issue.

In **Commonwealth v. Segarra**, 228 A.3d 943 (Pa. Super. 2020), Segarra was charged with raping D.G., and while preparing for trial the Commonwealth subpoenaed non-privileged medical records from the Horsham Clinic, where D.G. had received mental health treatment. The clinic disclosed all records, including privileged material, which the Commonwealth did not review and sent back to the clinic. Segarra filed a motion to compel discovery of D.G.'s mental health records, and D.G.'s attorney appeared on her behalf. The trial court "agreed that D.G.'s mental health records are privileged under the Mental Health and Procedures Act (MHPA) . . . and expressed concern that Segarra was on a 'fishing expedition to find inconsistent statements.'" **Id.** at 947 (citation omitted). Nevertheless, the court concluded that "because the Horsham Clinic had already disclosed the records, they were no longer subject to the same level of protection." **Id.** We first concluded that the materials were protected by the MHPA and that none of the statutory exceptions to disclosure applied. Turning to whether privilege was waived, we concluded:

> "As a general matter, once it is established that records are privileged from disclosure to third parties, the burden shifts to the party seeking disclosure to establish that an exception to the privilege exists which would allow the disclosure." **In re Fortieth Statewide Investigating Grand Jury**, 220 A.3d [558,] 568 [(Pa. 2019)] (citation omitted). Thus, the burden rests with Segarra to demonstrate that D.G. waived the privilege conferred by statute.

- 17 -

*Id.* at 955.

The *Segarra* Court explained that our Supreme Court has recognized an implicit waiver of records protected by the MHPA, but that concept is strongly disfavored and has been applied only where a plaintiff initiated a civil action and then invoked privilege as a shield. The *Segarra* Court refused to extend implicit waiver to the criminal realm.

> These considerations are not present here, as this matter is not a civil case, D.G. did not initiate the criminal case against Segarra, and when D.G. sought mental health treatment as a sexual assault complainant, she could not have reasonably foreseen that the records of that treatment would be made available to her alleged perpetrator. As our Supreme Court held in *Fortieth Statewide Investigating Grand Jury*, we likewise "decline to extend the principle of implicit waiver . . . to circumstances such as those presented by the case at bar."

*Id.* at 955–56 (footnote and citation omitted).

Appellant's argument for disclosure is that J.N. implicitly waived her privilege. "In the instant case, J.N. waived privilege by consenting to have Jessica Ventura testify to what J.N. had written and discussed about her alleged sexual abuse. Once this privilege was waived, all of Ms. Ventura's records should have been disclosed to defense counsel." Appellant's Brief at 30.[8] The foregoing analysis addresses Appellant's claim due to Appellant's

---

[8] Appellant's brief largely relies on *T.J.W.*, *supra*. There, the Commonwealth filed charges against T.J.W. based on his biological daughter C.W.'s recovery of repressed memories. T.J.W. argued that C.W.'s memories "were induced by controversial techniques employed" during psychotherapy. *Id.* at 1100. The investigating Pennsylvania State Police Trooper "had her sign releases and obtained records from various psychiatric and mental health treatment

*(Footnote Continued Next Page)*

concession that there was a psychotherapist/patient privilege.[9]    As in

*Segarra*, this is not a civil case; J.N. did not initiate the criminal charges; and

she could not have reasonably foreseen that her records would be disclosed

_____

providers" during the investigation, and the parties stipulated to an order directing C.W.'s counsel to redact any information asserted to be privileged and prepare a privilege log to be sent to T.J.W. and the Commonwealth. C.W.'s submission was apparently deemed inadequate as the trial court entered another order requiring C.W. to comply with the stipulated order. C.W. then appealed that order.

We held that privilege was waived, due to the stipulated order.  The panel stated that the trial court held the stipulated order in abeyance for three days to afford C.W. time to appeal if she chose.  She declined to do so, and we deemed her claim waived on that basis.  This case is readily distinguishable, as J.N. was not given any opportunity to respond to Appellant's request and she did not stipulate to any kind of order requiring production of those materials.

[9] Appellant agrees that the records were privileged under 42 Pa.C.S. § 5944, which states:

> No psychiatrist or person who has been licensed under the act of March 23, 1972 (P.L. 136, No. 52), to practice psychology shall be, without the written consent of his client, examined in any civil or criminal matter as to any information acquired in the course of his professional services in behalf of such client.  The confidential relations and communications between a psychologist or psychiatrist and his client shall be on the same basis as those provided or prescribed by law between an attorney and client.

42 Pa.C.S. § 5944 (footnote omitted).

Appellant does not separately address whether the records were protected by the MHPA.  As stated in *Segarra*, the Section 5944 privilege "is designed to protect confidential communications made and information given by the client to the psychotherapist in the course of treatment, but does not protect the psychotherapist's own opinion, observations, diagnosis, or treatment alternatives."  *Segarra*, 228 A.3d at 953-54 (citation omitted)*.* Appellant specifically claimed that he was entitled to know "all of the conversations that [Ventura] had with [J.N.]"  N.T., 11/15/21, at 87.

to Appellant based on the Commonwealth's decision to have Ventura testify to J.N.'s prior statements. On that point, we add that Appellant's request for these records was largely an afterthought and he never specifically requested an order compelling disclosure. Instead, Appellant merely suggested that he would be entitled to them if a formal motion were filed. "There's no probative value to keep repeating the statements and it's duplicative. I would also add if Your Honor does admit these statements, **I believe I would be entitled to full contents of Ms. Ventura's file** regarding all of the conversations that she's had with [J.N.]." N.T., 11/15/21, at 87 (emphasis added). Finally, the failure to formally seek these records means that there is no indication that J.N. was aware of the request or given an opportunity to respond.[10] To the extent that Appellant validly requested the records, we find that the trial court committed no error as Appellant failed to establish that J.N. waived the privilege.

Appellant's final claim is that the trial court erred by imposing a no contact order with J.N. and her family during his term of incarceration as well as upon parole if granted. The Commonwealth concedes that this portion of Appellant's sentence is illegal.

Beginning with parole, the Board of Probation and Parole has the exclusive power to impose parole conditions. **See** 61 Pa.C.S. § 6132(a)(1)(i)

---

[10] It is also unclear whether, as in **Segarra**, the Commonwealth ever possessed the records in question. The waiver argument in **Segarra** was based on the clinic's decision to send the entire file to the Commonwealth.

("The board shall have exclusive power . . . [t]o parole and reparole, commit and recommit for violations of parole[.]"). The sentencing judge "may make at any time a recommendation" relative to parole conditions, and those recommendations "respecting the parole or terms of parole of an offender shall be advisory." 61 Pa.C.S. § 6134(1); (2).

Turning to the trial court's attempt to impose the "no contact" condition during Appellant's period of incarceration, the court identifies no statutory authority permitting it to do so, and such an order would seemingly interfere with the Department of Corrections' authority to regulate and administer its facilities. At least two unpublished decisions have concluded that a trial court lacks authority to impose such conditions. **See Commonwealth v. Richardson**, 1555 MDA 2022 (unpub. memo. at 5) (Pa. Super. March 21, 2023); (concluding that "the sentencing court lacked statutory authority to impose incarceration and parole conditions"); **Commonwealth v. Olivo-Vazquez**, 730 MDA 2020 (unpub. memo.) (Pa. Super. January 5, 2021) (same). We therefore agree that these portions of Appellant's sentence must be vacated.

However, we need not remand for resentencing as no other aspect of Appellant's sentence will be disturbed by striking that condition. **See Commonwealth v. Coulverson**, 34 A.3d 135, 142 (Pa. Super. 2011) ("Accordingly, to the extent the trial court purported to impose conditions of parole in its sentencing order, those conditions and the order exceed the bounds of the court's authority and are subject to *vacatur,* which we hereby

- 21 -

direct."). If the court wishes to communicate its advisory comments, it may do so pursuant to 61 Pa.C.S. § 6134.

The "no contact" provisions of Appellant's sentence are vacated. Judgment of sentence affirmed in all other respects. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/21/2023